ESTATE OF WILLIAM F. LUTON, DECEASED, NANCY L. JACKSON, ROBERT S. HERDMAN, AND WILLIAM F. LUTON, JR., CO-EXECUTORS, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Estate of Luton v. Commissioner
Docket No. 23339-91
United States Tax Court
T.C. Memo 1994-539; 1994 Tax Ct. Memo LEXIS 550; 68 T.C.M. (CCH) 1044; October 27, 1994, Filed *550 Decision will be entered under Rule 155. For petitioner: Richard J. Sideman and Wendy Abkin. For respondent: Cynthia K. Hustad and Mary E. Wynne. PARR
PARR
MEMORANDUM FINDINGS OF FACT AND OPINION PARR, Judge: Petitioner is the Estate of William F. Luton. Respondent determined a deficiency of $ 7,212,448 in petitioner's estate tax. Respondent also determined that petitioner was liable for an addition to tax for negligence under section 6653(a)(1)(A) in the amount of $ 360,622, plus 50 percent of the interest due on the deficiency under section 6653(a)(1)(B), and was liable for an addition to tax of $ 1,095,102 for a valuation understatement under section 6660. [1] By amendment to answer, respondent revised the deficiency to $ 7,707,179 and additions to tax for negligence and valuation understatement to $ 385,359 and $ 1,104,675, respectively. *551 After stipulations and concessions, the issues for decision are: (1) Whether the value of petitioner's 78-percent interest in the common stock of Rancho San Juan, Inc., on the alternate valuation date [2] was $ 5,336,000 as determined by respondent. We hold that the value was $ 4,492,800. (2) Whether the value of petitioner's one-third interest in the common stock of Dune Lakes, Ltd., on the alternate valuation date was $ 1,440,000 as determined by respondent. We hold that the value was $ 1,040,000. (3) Whether the value of petitioner's 41.9-percent interest in the Miramonte Liquidating Trust on the alternate valuation date was $ 3,250,000 as determined by respondent. We hold for respondent. (4) Whether petitioner is liable for an addition to tax for undervaluation pursuant to section 6660. We hold that petitioner is not liable for such addition. FINDINGS OF FACT Some of the *552 facts have been stipulated and are so found. The stipulation of facts with attached exhibits and stipulation of partial agreement are incorporated herein by this reference. William F. Luton (hereinafter decedent) was a resident of the State of California at the time of his death on April 27, 1987. At the time of the filing of the petition, coexecutor Nancy L. Jackson (decedent's daughter) resided in the State of Idaho, and coexecutors Robert S. Herdman [3] and William F. Luton, Jr. (decedent's son), resided in the State of California. Rancho San Juan
In 1934, decedent acquired by gift a ranch in Santa Barbara County known as Rancho San Juan. In 1936, decedent and his wife, Nancy Luton, established their residence on Rancho San Juan, where they lived until the dates of their respective deaths. In 1941 and 1958, decedent and his wife acquired, as community property, two parcels of land in Santa Barbara County contiguous to Rancho *553 San Juan. Hereafter, unless otherwise stated, the three parcels will be referred to collectively as Rancho San Juan. In 1968, decedent and his wife signed a contract with the County of Santa Barbara concerning limitations on the use and development of Rancho San Juan, pursuant to the California Land Conservation Act of 1965 (hereafter referred to as the Williamson Act). The agreement is effective for 10 years and is automatically extended for 1 year at the end of each year of the contract so that it will always have a term of 10 years, unless notice of termination is given. The quid pro quo for the landowners is favorable property tax treatment. On August 13, 1982, Rancho San Juan was incorporated under the laws of California as a corporation wholly owned by decedent and his wife. Decedent received 44,760 shares as community property with his wife and 55,240 shares as separate property in exchange for the right, title, and interest in the real property comprising Rancho San Juan. The corporation (RSJ, Inc.) assumed all of the obligations, conditions, and restrictions set forth in the contracts with the county. Effective December 1, 1986, RSJ, Inc., made an election to be treated *554 as an S corporation for Federal tax purposes. Stock in RSJ, Inc., is not publicly traded. In years 1982-86, decedent transferred some shares of RSJ, Inc. stock (1) into trusts created for the benefit of his grandchildren and (2) into the name of each of his six children. At the time of his death, decedent still held 78-percent (78,000 shares) of the stock of RSJ, Inc., in his own name. [4] Decedent paid RSJ, Inc., rent for the right to live on Rancho San Juan. Dune Lakes, Ltd.
Dune Lakes, Ltd., was formed on June 24, 1931. The principal asset of Dune Lakes, Ltd., is real estate in San Luis Obispo County, California. Most of the corporation's acreage has been operated as a duck-hunting preserve. The remaining sections of the land are either leased for agricultural purposes, zoned for 5-acre lots, or subject to sensitive resource area restrictions. In 1973 and 1974, Dune Lakes, Ltd., entered into *555 a contract with the County of San Luis Obispo concerning limitations on use and development of the property pursuant to the Williamson Act. In 1983, decedent acquired 1 share of the 3 outstanding shares of Dune Lakes, Ltd., by inheritance from his wife. [5] Effective January 1, 1987, the corporation made an election to be treated as a S corporation for Federal tax purposes. Stock in Dune Lakes, Ltd., is not publicly traded. Miramonte Trust
As of December 1984, the shareholders of Key Television, Inc., consisted of decedent and members of his family. On December 7, 1984, Key Television, Inc., sold substantially all of its assets to Shamrock Holdings, Inc. (hereafter Shamrock), for cash, plus an unsecured promissory note. Key Television, Inc., changed its name to Miramonte *556 Drive Corp., and filed a certificate of election to wind up and dissolve pursuant to section 337. On or about September 30, 1985, the nondistributed assets of Miramonte Drive Corp., were contributed to the Miramonte Liquidating Trust (hereafter the Miramonte Trust). Decedent and William F. Luton, Jr., were the trustees of the Miramonte Trust. The principal asset of the Miramonte Trust is a note receivable dated December 7, 1984, from Shamrock in the amount of $ 7,700,000 with interest of 10 percent payable semiannually beginning December 31, 1984, through maturity. The principal is payable in 15 semiannual installments of $ 250,000 beginning December 31, 1988, and a final principal payment of $ 3,950,000 on June 30, 1996. The note is not listed on a public exchange. The trust agreement provides that a vote of two-thirds of the trust units could force the trustee to liquidate. The terms of the trust also provide a right of first refusal restriction upon the transfer of any unit. The right of first refusal exists for a 35-day period. At the time of his death, decedent owned 41.9 percent of the units of the Miramonte Trust. Valuation
Decedent's estate is being administered *557 under the laws of the State of California. The executors engaged an attorney, Mr. Howard M. Simon, to prepare the Federal estate tax return for petitioner. In this regard appraisers were sought to determine the fair market values of the assets included in the gross estate. Mr. Philip Moore, president of Seligman Valuations and an individual with academic and professional experience as an appraiser, was selected to appraise the value of petitioner's interests in the stock of RSJ, Inc., and of Dune Lakes, Ltd., and in the Miramonte Drive Liquidating Trust. Mr. Simon provided Mr. Moore with appraisals of the real estate owned by Dune Lakes, Ltd., and RSJ, Inc., that had previously been prepared by Mr. Harold Miossi and Mr. James Paddock, respectively. Mr. Miossi is a California probate referee for San Luis Obispo County, a position he has held since 1960. Mr. Paddock has over 50 years' experience in appraising real estate in the Santa Barbara area and throughout California. We recognize as experts Mr. Moore, Mr. Miossi, and Mr. Paddock. In the stipulation of partial agreement, the parties agreed that the value of the underlying real estate would be equal to that amount determined *558 by a Mr. Dunshee, an appraiser since 1952 and recognized as an expert appraiser of agricultural land and cattle ranches. He determined a value of $ 4,800,000 and $ 7,200,000 respectively, for the assets of Dune Lakes and Rancho San Juan, without consideration of any discounts. The amount of discounts is still in dispute. At trial, petitioner presented testimony and submitted a written report from Dr. Shannon P. Pratt as to the value of the stock and the trust units. See Rule 143(f). Dr. Pratt is the managing director of a firm specializing in financial research and analysis, especially the valuation of businesses and business interests. Dr. Pratt holds a doctorate of finance, is a member of the American Society of Appraisers, and is a certified financial planner. Dr. Pratt is also the author of two reference works on business valuation. Respondent countered with testimony and a written report from her own expert Ms. Margaret N. Singleton. Ms. Singleton is the president of an appraisal firm doing real estate and business appraisals. She has experience as an appraiser for various private companies and the Wisconsin Department of Revenue, where she valued rural properties and *559 farms. Ms. Singleton is a member of professional valuation organizations; she teaches and has published articles relating to valuation. We recognize both Dr. Pratt and Ms. Singleton as experts. Respondent issued a statutory notice of deficiency to petitioner, asserting deficiencies in and additions to petitioner's Federal estate tax. The greater part of that deficiency, and the only part here in issue, results from respondent's determination that the fair market value of certain shares of corporate stock and of units in a liquidating trust owned by decedent at the date of his death, and valued at the alternate valuation date, were undervalued on petitioner's estate tax return. Similarly the addition to tax in issue relates to the undervaluation as determined by respondent. The other numerous determinations which make up the determined deficiency relate to undervaluation of other property (including real estate, corporate stocks and bonds, mortgages, and notes owned by decedent at the date of his death and valued at the alternate valuation date); omission of a retained life estate; previously agreed adjustments; disallowance of administration expenses; disallowance of debts of *560 the decedent; adjusted taxable gifts; and penalties for negligence or intentional disregard of rules and regulations. All of these other issues have been resolved in the stipulation of partial agreement. OPINION Valuation of Property
The general rule for valuing property to be included in a decedent's gross estate is provided in section 2031 and the regulations thereunder. Property includable in a decedent's gross estate is included at its fair market value as of the date of the decedent's death or the alternate valuation date as provided under section 2032. Secs. 2031(a) and 2032(a); sec. 20.2031-1(b), Estate Tax Regs. Fair market value is a question of fact, with the trier of fact having the duty to weigh all relevant evidence of value and to draw appropriate inferences. Commissioner v. Scottish American Inv. Co., 323 U.S. 119, 123-125 (1944); Helvering v. National Grocery Co., 304 U.S. 282, 294 (1938); Hamm v. Commissioner, 325 F.2d 934, 938 (8th Cir. 1963), affg. T.C. Memo. 1961-347; Skripak v. Commissioner, 84 T.C. 285, 320 (1985); *561 Zmuda v. Commissioner, 79 T.C. 714, 726 (1982), affd. 731 F.2d 1417 (9th Cir. 1984). Fair market value represents the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts. United States v. Cartwright, 411 U.S. 546, 551 (1973); Gillespie v. United States, 23 F.3d 36 (2d Cir. 1994); Estate of Hall v. Commissioner, 92 T.C. 312, 335 (1989); sec. 20.2031-1(b), Estate Tax Regs. All relevant facts and elements of value as of the applicable valuation date should be considered in every case. Estate of Johnson v. Commissioner, 77 T.C. 120, 124 (1981), revd. on other grounds 718 F.2d 1303 (5th Cir. 1983); sec. 20.2031-1(b), Estate Tax Regs. And any knowledge of future events not known or reasonably anticipated on the valuation date that might affect the value of the stock cannot be attributed to the willing seller or buyer. Estate of Bennett v. Commissioner, T.C. Memo. 1993-34; *562 sec. 20.2031-1(b), Estate Tax Regs. The willing buyer and seller are hypothetical persons, instead of specific individuals or entities. Estate of Newhouse v. Commissioner, 94 T.C. 193, 218 (1990). The fair market value of a particular item of property is not to be determined by a forced sale price. Sec. 20.2031-1(b), Estate Tax Regs. Nor is the fair market value of an item of property to be determined by the sale price of the item in a market other than that in which such item is most commonly sold to the public. Id.
Valuation of Closely Held Stock
In determining the value of stock that is not listed on an exchange, actual arm's-length sales of such stock in the normal course of business within a reasonable time before or after the valuation date are the best criteria of market value. Estate of Andrews v. Commissioner, 79 T.C. 938, 940 (1982); Duncan Industries, Inc. v. Commissioner, 73 T.C. 266, 276 (1979). However, if the stock has never been publicly traded, and there is no evidence of any sales of stock in the corporation at any time near the date of a decedent's death, *563 the value of the closely held stock must be determined indirectly, by weighing the corporation's net worth, prospective earning power, dividend-paying capacity, and other relevant factors. Estate of Andrews v. Commissioner, supra; Estate of Leyman v. Commissioner, 40 T.C. 100, 119 (1963), affd. in part and remanded in part 344 F.2d 763 (6th Cir. 1965), vacated and remanded 383 U.S. 832 (1966); sec. 20.2031-2(f), Estate Tax Regs. These factors cannot be applied with mathematical precision. Estate of Andrews v. Commissioner, supra at 941. Rather, the weight to be given to each factor must be tailored to account for the particular facts of each case. Messing v. Commissioner, 48 T.C. 502, 512 (1967). Similarly, section 2031(b) provides that the value of unlisted stock "shall be determined by taking into consideration, in addition to all other factors, the value of stock or securities of corporations engaged in the same or a similar line of business which are listed on an exchange." [6]
*564 This Court has recognized that the valuation of stock in a closely held family corporation is always a difficult question. Estate of Tompkins v. Commissioner, T.C. Memo. 1961-338. "[Fair market] value is a fact, the determination of which is, at least, generally difficult. The result is rarely satisfactory." Estate of McKitterick v. Commissioner, 42 B.T.A. 130, 136 (1940). The difficulty is compounded where a substantial part of the corporation's assets consists of unimproved land, which is itself difficult to value. Estate of Tompkins v. Commissioner, supra.Before we can place a value on the stock, we must first determine the fair market value, as of the valuation date, of the underlying assets. Id.
Expert Opinion
Both parties relied upon experts to consider and analyze the intrinsic factors of the underlying real estate in order to derive a valuation of the corporations' stock. However, due to fundamental differences in approach between the parties' experts, particularly with respect to the weight to be placed upon net-asset value as opposed to earnings capacity *565 or liquidation analysis, the valuations determined by the experts were quite far apart. Respondent's determination of the fair market value of petitioner's assets is presumed correct, and petitioner bears the burden of overcoming the presumption of correctness. Rule 142(a); Welch v. Helvering, 290 U.S. 111 (1933); Estate of Carli v. Commissioner, 84 T.C. 649 (1985); Hutchens v. Commissioner, T.C. Memo. 1993-600; Estate of Yeager v. Commissioner, T.C. Memo. 1986-448. Respondent bears the burden of proof with regard to any amount in excess of the valuation determined in the notice of deficiency. Rule 142(a). At trial, we received testimony from expert witnesses, and we weigh that testimony in light of the experts' qualifications as well as all the other credible evidence. Estate of Newhouse v. Commissioner, supra; Estate of Gilford v. Commissioner, 88 T.C. 38, 56 (1987). Nonetheless, we are not bound by the opinion of any expert witness and will accept or reject expert testimony in the exercise *566 of sound judgment. Helvering v. National Grocery Co., 304 U.S. at 295; Estate of Newhouse v. Commissioner, supra; Estate of Hall v. Commissioner, 92 T.C. at 338. We may adopt some portions and reject other portions of expert testimony as we weigh its persuasiveness and helpfulness. Chiu v. Commissioner, 84 T.C. 722, 734 (1985); Estate of Bennett v. Commissioner, T.C. Memo. 1993-34. Furthermore, we recognize, "'Valuation is * * * necessarily an approximation * * * It is not necessary that the value arrived at by the trial court be a figure as to which there is specific testimony, if it is within the range of figures that may properly be deduced from the evidence.'" Silverman v. Commissioner, 538 F.2d 927, 933 (2d Cir. 1976) (quoting Anderson v. Commissioner, 250 F.2d 242, 249 (5th Cir. 1957)), affg. T.C. Memo. 1974-285; Estate of Bennett v. Commissioner, T.C. Memo. 1993-34. Issue 1. Value of 78-Percent *567 Stock Interest in Rancho San Juan
Value of Underlying Real Estate
The parties have agreed to the value of $ 7,200,000 for the underlying real estate of RSJ, Inc., However, based on Mr. Dunshee's analysis, petitioner argues that a $ 1 million discount is appropriate for the time it would take to sell Rancho San Juan if all three parcels of the land were placed on the market at the same time. Mr. Dunshee believes that a 13,000-acre parcel would be very difficult to sell, and the highest value for the property could be obtained by dividing the real property into three new parcels and selling them individually. Mr. Dunshee discounted the total anticipated sales proceeds at a discount rate of 12 percent over 2 years, taking into account the cost of money as of the valuation date and accounting for risk factors and some sales costs. Respondent counters that such a discount is inappropriate. The ranches were incorporated and the stock was given to decedent's heirs to ensure that the land would stay in the family. Therefore, the likelihood of sale was speculative. Respondent contends that the proper method of valuation for the underlying real estate is the net asset value approach. *568 We have repeatedly held that costs of sale or costs incurred in liquidation are not proper deductions in arriving at value for purposes of section 2031 wherein the sale or liquidation is only speculative. Estate of Piper v. Commissioner, 72 T.C. 1062, 1087 (1979); Estate of Cruikshank v. Commissioner, 9 T.C. 162, 165 (1947); Estate of Bennett v. Commissioner, supra; Estate of Munroe v. Commissioner, a Memorandum Opinion of this Court dated Mar. 6, 1946; see also Campbell's Estate v. Kavanagh, 114 F. Supp 780 (E.D. Mich. 1953). We have also held that a discount to asset values for the "lost use of money" is inappropriate. Estate of Andrews v. Commissioner, 79 T.C. at 950. "[D]iscounting for lost use of money is unrealistic because it fails to recognize that the underlying assets will themselves appreciate, most probably, at a rate similar to that applied as a discount." Id.
We find no evidence in the record to support a conclusion that Rancho San Juan would be sold. The ranches have been in the family for over *569 50 years and based on testimony by family members William Luton, Jr., and Brandy Branquinho and decedent's acts of giving the stock each year to his family members, we conclude that petitioner never intended to have the corporation offer the real estate for sale. The probability of a sale was therefore speculative at best. In addition, Mr. Dunshee acknowledged that the parcels were increasing in value due to the proximity of Rancho San Juan to the Santa Ynez Valley. Accordingly, we sustain respondent's position that no discount is appropriate. Value of Stock Interest -- RSJ, Inc.
Petitioner valued decedent's interest in RSJ, Inc., on the estate tax return at $ 2,275,000. After concessions, as to the underlying real estate, petitioner asserts that the value of RSJ, Inc., is $ 2,900,000. Respondent determined the value to be $ 5,336,000. Mr. Moore, petitioner's expert, used a liquidation analysis in valuing petitioner's 78-percent interest because in his opinion the highest value that could be realized for the 78-percent interest would be obtained by liquidating the corporate assets and then selling the underlying real estate. In Mr. Moore's opinion, any substantial development *570 of the real property within the next 10 years was highly unlikely and would be very costly due to the restrictions placed on the real property by the Williamson Act and the prevailing attitude towards development in Santa Barbara County. Furthermore, Mr. Moore claims that the liquidation analysis should be used because the land was not suitable for other productive uses besides cattle ranching, and the corporation would have generated little or no current income other than from lease payments. Mr. Moore started with an appraised value of the real estate of $ 5,700,000. [7] He then subtracted selling costs and State and Federal capital gains tax and applied a 40-percent lack of marketability discount in arriving at the fair market value of $ 2,281,032 that he assigns to decedent's stock interest in RSJ, Inc. Mr. Moore's approach of calculating value based upon the net proceeds realizable from the sale of the underlying real estate was based on his opinion that the hypothetical willing buyer would evaluate an investment in the stock based upon its potential return, after accounting for transactional costs. *571 Petitioner asserts that if the Court determines that Mr. Moore's opinion is not persuasive, then, in the alternative, Dr. Pratt's, petitioner's expert's, opinion of the fair market value of the stock should be adopted. Dr. Pratt's analysis was based on comparisons to the stock prices of publicly traded real estate companies. Dr. Pratt's analysis led him to conclude that the valuation of decedent's stock should be based on the value of the publicly traded comparables and should reflect a discount for the lack of marketability of stock in a closely held corporation. Respondent asserts that the valuation should be based on the net asset value of the corporation. Respondent contends that the corporation's operations are irrelevant since a purchaser/investor is purchasing the controlling interest in a corporation holding real estate that was free and clear of all liens. Accordingly, respondent asserts that the value of the underlying assets is the focus in valuing the real estate company. Furthermore, respondent, citing Rev. Rul. 59-60, argues that the underlying values of the real estate give due weight to the potential earnings and dividends *572 resulting from the assets. Rev. Rul. 59-60, 1959-1 C.B. 237. Respondent would have us reject Dr. Pratt's analysis for lack of a comparable corporation. Respondent asserts, based on her expert's opinion, that no more than a 5-percent discount for lack of marketability is appropriate. Respondent argues that the 78-percent block provides a holder with voting control in all matters. And pursuant to California law, a corporation may voluntarily liquidate if the shares representing 50 percent or more so vote. Cal. Corp. Code sec. 1900(a) (West Supp. 1994). In addition, California law provides that involuntary dissolution may only be petitioned by shareholders holding at least one-third of the outstanding shares. Cal. Corp. Code sec. 1800 (West Supp. 1994). Because California law provides a 78-percent holder with expansive control of the corporation and its assets, Ms. Singleton applied a 5-percent marketability discount to decedent's interest in RSJ, Inc., merely to acknowledge the existence of relatively powerless minority shareholders. Respondent asserts that any potential capital gains tax would be avoidable because of RSJ, Inc.,'s *573 status as an S corporation. Reduction for Selling Costs and Capital Gains Taxes
As discussed above, regarding the discount applied to the underlying real estate, we find no merit to applying reductions for selling costs when the prospect of liquidation is remote. Consequently, we sustain respondent's disallowance of a reduction of fair market value for selling costs. This Court has consistently held that a discount for potential capital gains tax at the corporate level is unwarranted where there is no evidence that (1) a liquidation of the corporation was planned, or (2) the liquidation could not have been accomplished without incurring a capital gains tax at the corporate level. Estate of Piper v. Commissioner, 72 T.C. at 1087; Estate of Cruikshank v. Commissioner, 9 T.C. at 165; Estate of McTighe v. Commissioner, T.C. Memo. 1977-410; Gallun v. Commissioner, T.C. Memo. 1974-284; Estate of Thalheimer v. Commissioner, T.C. Memo. 1974-203, affd. on this issue and remanded 532 F.2d 751 (4th Cir. 1976). *574 To the extent a capital gains tax at the corporate level would be relevant, it is mitigated by RSJ, Inc.,'s status as a subchapter S corporation. Prior to the Tax Reform Act of 1986, Pub. L. 99-514, 100 Stat. 2085, an S corporation was not subject to tax with respect to any built-in capital gains if the S corporation election had been in effect for the 3 taxable years immediately preceding the year in which the capital gains were reported. Subchapter S Revision Act of 1982, Pub. L. 97-354, sec. 2, 96 Stat. 1669, 1683. RSJ, Inc., elected S corporation status as of December 1, 1986, and it filed a short year S corporation tax return beginning December 1, 1986, and ending December 31, 1986, and calendar year returns thereafter. The 3-year period ended as of December 31, 1988. Accordingly, with the exception of the 14-month period from the valuation date until December 31, 1988, RSJ, Inc.,'s built-in capital gains could be recognized without a corporate level tax. Notwithstanding the potential elimination of any corporate level tax, we do recognize that some discount is in order. We believe such discount is appropriately considered in the discount for lack of marketability, discussed *575 below. We sustain respondent's disallowance of a reduction of fair market value due to corporate capital gains tax. Lack of Marketability Discount
"The lack of marketability discount * * * is designed to reflect the fact that there is no ready market for shares in a closely held corporation." Estate of Andrews v. Commissioner, 79 T.C. at 953; see also Central Trust Co. v. United States, 158 Ct. Cl. 504, 305 F.2d 393, 405 (1962). This principle has been applied to controlling as well as minority shares. Estate of Maxcy v. Commissioner, T.C. Memo. 1969-158, revd. on other grounds 441 F.2d 192 (5th Cir. 1971). But this Court has found that a discount for lack of marketability is not warranted where a decedent owned all of the stock of a company whose assets consisted solely of cash and marketable securities (liquid assets). Estate of Jephson v. Commissioner, 87 T.C. 297 (1986). And in a case involving an 80-percent stock interest in a corporation whose underlying asset was a ranch, we held that a lack of marketability *576 discount was inapposite. Estate of O'Connell v. Commissioner, T.C. Memo. 1978-191, affd. in part and revd. in part on other grounds 640 F.2d 249 (9th Cir. 1981). We made our conclusion based on the fact that there were no publicly traded ranch stocks from which to draw a comparison and no limiting use restriction on the property. We concluded that a discount was inappropriate and determined that the net asset value was the fair market value. Id.
Petitioner has presented a great deal of evidence in the form of testimony and written reports from Dr. Pratt with regard to the selling prices on exchanges of the stock of other corporations which could be classified as real estate holding corporations. In this regard, we have recognized the statutory mandate of section 2031(b) that -- In the case of stock and securities of a corporation the value of which, by reason of their not being listed on an exchange and by reason of the absence of sales thereof, cannot be determined with reference to bid and asked prices or with reference to sales prices, the value thereof shall be determined by taking into consideration, in *577 addition to all other factors, the value of stock or securities of corporations engaged in the same or a similar line of business which are listed on an exchange. [Emphasis added.]
Estate of Newhouse v. Commissioner, 94 T.C. at 217; Estate of Tompkins v. Commissioner, T.C. Memo. 1961-338. However, this Court has rejected comparables if sufficient dissimilarities exist. Estate of Hall v. Commissioner, 92 T.C. 312 (1989); Northern Trust Co. v. Commissioner, 87 T.C. 349 (1986); Estate of O'Connell v. Commissioner, supra; Estate of Tompkins v. Commissioner, supra.
The comparables chosen by Dr. Pratt were both operating real estate companies. Neither of those corporations held real estate in the form of a ranch. And one of the corporations owned real estate in Orlando, Florida. Respondent questioned Dr. Pratt on cross-examination about why he did not use as a comparable Newhall Land and Farming (Newhall), a corporation which owns ranch land in Southern California, and Tejon Ranch Co. *578 (Tejon), whose primary assets were 270,000 acres of ranch land in Southern California. Dr. Pratt dismissed the use of Tejon, because he claims that he could not obtain sufficient information on the publicly traded company, and Newhall because he claims that the share prices reflected the trades of minority shareholders. Few or no similarities between RSJ, Inc., and the so-called comparable companies were shown. We do not find persuasive petitioner's self-serving statement, on brief, that "Dr. Pratt's analysis would not be different if the comparables owned 'ranching' land rather than a mix of real estate that included undeveloped land." We find that no publicly traded companies are present in the record from which we can draw a comparison. Notwithstanding the lack of a comparable company, a discount in the value of the closely held stock is appropriate for lack of marketability. The discount should reflect that restrictions are placed on the land as a result of the Williamson Act and that the assets of the corporation are not liquid. Respondent would have us believe that no discount is appropriate, citing Estate of O'Connell v. Commissioner, supra, *579 wherein an 80-percent interest in a ranching corporation was valued at 80 percent of the net asset value. However, the ranch in that case was free of restrictions on use. In contrast, Rancho San Juan is subject to the Williamson Act, for at least 10 years. Using the stipulated value of the real estate without any discount, using a net asset valuation approach, and applying a 20-percent discount for lack of marketability, the Court's valuation of the 78-percent interest in RSJ, Inc., as of the alternate valuation date is $ 4,492,800. Issue 2. Value of One-Third Stock Interest in Dune Lakes, Ltd.
Petitioner valued decedent's interest in Dune Lakes, Ltd., on the estate tax return at $ 465,000. After concessions as to the underlying real estate, petitioner asserts that the value of decedent's one-third interest in Dune Lakes, Ltd., is $ 505,000. Respondent determined the value to be $ 1,440,000. Petitioner relies on the valuation used for its estate tax return as prepared by Mr. Moore and as supported by the valuation done for trial by Dr. Pratt. Mr. Moore used a liquidation analysis in valuing petitioner's one-third interest, because in his opinion the highest value that *580 could be realized for the one-third interest would be obtained by liquidating the corporate assets and selling the real property. Mr. Moore explained that a liquidation analysis was the appropriate valuation method because (1) the corporation had been operating at a loss for several years and required regular infusions of additional capital from its shareholders, and (2) no other significant assets existed on the balance sheet. Mr. Moore concluded that the hypothetical willing buyer would evaluate an investment in the stock based upon its potential return, after accounting for transactional costs. Mr. Moore determined that a 35-percent discount was appropriate in light of the inability of the potential investor to unilaterally cause the liquidation of the corporate assets. Mr. Moore started with an appraised value of the land of approximately $ 4.3 million. He then subtracted selling costs and commissions, a 25-percent lack of marketability, and Federal and California capital gains taxes and arrived at an after-tax selling price of approximately $ 2.1 million. Mr. Moore then divided the interest into thirds and applied a 35-percent minority interest discount in arriving at a *581 fair market value of $ 463,653. [8]
Petitioner asserts that if the Court determines that Mr. Moore's opinion is not persuasive, then, in the alternative, Dr. Pratt's opinion of the fair market value of the stock should be adopted. As he did with RSJ, Inc., Dr. Pratt utilized publicly traded companies in determining a fair market value of $ 641,481 for decedent's interest in Dune Lakes, Ltd. In her argument respondent asserts that due to the uniqueness of the real estate (1,450 of the 1,700 acres comprises wetlands, also referred to as the duck preserve) the value of the land is in long-term investment. A purchaser would probably be interested in the intangible benefits associated with the scenic beauty and conservational aspects of the *582 property. And respondent further argues that because of the unique nature of the underlying assets, no comparable exists. Respondent's calculation of fair market value begins with the parties' stipulated amount of $ 4,800,000 for the real estate. Respondent then applies a minority interest discount of 10 percent which she claims is appropriate because California Corporation Law provides substantial protection for minority shareholders holding one-third or more of the stock in a corporation. Respondent argues against imposing a discount for lack of marketability since (1) the property's uniqueness makes it desirable, and (2) there are no corporate tax problems present due to the corporation's status as an S corporation. Accordingly, respondent would have us value petitioner's one-third interest in Dune Lakes, Ltd., at its net asset value adjusted for a 10-percent discount to account for the minority interest and whatever minimal marketability concerns exist. Reduction for Selling Costs and Capital Gains
As discussed above, costs of sale or costs incurred in liquidation are not proper deductions in arriving at value for purposes of section 2031, wherein the sale or liquidation *583 is only speculative. Estate of Piper v. Commissioner, 72 T.C. at 1087; Estate of Cruikshank v. Commissioner, 9 T.C. at 165; Estate of Bennett v. Commissioner, T.C. Memo. 1993-34. The Dune Lakes property had been maintained as open space and wetlands for over 60 years and used only by the shareholders, who were all family members, and their guests. In addition, the experts are generally in agreement that the property is unique. In fact, Mr. Miossi stated that he did not believe there was another property like Dune Lakes in California. We conclude that petitioner did not take into account these factors in determining value. Accordingly, we sustain respondent's disallowance of a reduction in value for selling expenses. With regard to corporate capital gains taxes, we sustain respondent's similar disallowance since we are of the opinion that a liquidation of the company was not planned, or in the alternative, it could be accomplished without incurring a capital gains tax at the corporate level as a result of Dune Lakes' status as an S corporation. [9]
*584 Lack of Marketability Discount
As we discussed in our analysis for RSJ, Inc., a lack of marketability discount is appropriate in recognition that there is no ready market for the shares in a closely held corporation. Estate of Andrews v. Commissioner, 79 T.C. at 953; see also Central Trust Co. v United States, 158 Ct. Cl. 504, 305 F.2d 393, 405 (1962). Similarly, we believe that a lack of marketability discount is appropriate due to the Williamson Act restrictions placed on the property. Since we have already rejected Mr. Moore's liquidation analysis, we turn to Dr. Pratt's use of comparables. Petitioner admits that the Dune Lakes property is a unique piece of real estate in California. Petitioner also admits that the companies selected as comparables differed, but were the best available comparables. As we have previously discussed, we may reject the use of comparables if we find the companies selected to have material dissimilarities. And although the comparables used are the best available, we can still reject the market-comparable approach if we find insufficient similarities for us to rely *585 on the purported comparables. Northern Trust Co. v. Commissioner, 87 T.C. at 377. We do not believe the companies used as comparables are sufficiently similar to Dune Lakes, Ltd. Accordingly, we are not persuaded by Dr. Pratt's analysis. Respondent contends that lack of marketability has already been considered in determining the value of the underlying real estate, and therefore a lack of marketability discount is not appropriate. We are not persuaded by this contention; as we have already stated, we believe a marketability discount is appropriate. Based on the evidence submitted and our analysis of the various expert reports, we hold that a lack of marketability discount of 15 percent from net asset value is appropriate. In arriving at the amount of marketability discount we note that the discounts for minority interest and lack of marketability are conceptually distinct. Estate of Newhouse v. Commissioner, 94 T.C. at 249. Lack of marketability reflects that there is no ready market for the shares, while minority discount reflects the minority shareholders' inability to compel liquidation and inability to realize *586 a pro rata share of the corporation's net asset value. Id. We now turn our analysis to minority discount. Minority Interest Discount
Petitioner's main argument for upholding a minority discount is the fact that a potential investor could not unilaterally cause the liquidation of the corporate assets. Respondent, relying on California corporate law, argues that a shareholder with a one-third interest with sufficient cause could sue for dissolution and would receive a pro rata share of the corporate equity, whether from liquidation or a buyout. We have held that a minority discount is appropriate if the block of stock does not enjoy the variety of rights associated with control. Estate of Chenoweth v. Commissioner, 88 T.C. 1577, 1582 (1987); Harwood v. Commissioner, 82 T.C. 239, 267 (1984), affd. without published opinion 786 F.2d 1174 (9th Cir. 1986); Estate of Andrews v. Commissioner, supra at 957. We have defined control to mean "that, because of the interest owned, the shareholder can unilaterally direct corporate action, select management, decide *587 the amount of distribution, rearrange the corporation's capital structure, and decide whether to liquidate, merge, or sell assets." Estate of Newhouse v. Commissioner, supra at 251-252. Where indications of value are predicated upon control or complete ownership, a discount must be applied to provide indications of value for a minority or less-than-controlling interest. Estate of Jung v. Commissioner, 101 T.C. 412, 442 n. 11 (1993) (quoting Zukin & Mavredakis, Financial Valuation: Businesses and Business Interests, par. 6.9[2], at 6-39 (1990)). And while the appropriate amount of discount to apply is a question of fact, it is generally unreasonable to argue that no discount should be considered for a minority interest in a closely held corporation. Estate of Newhouse v. Commissioner, supra at 249. In the instant case, a purchaser of petitioner's interest in Dune Lakes, Ltd., would be acquiring an interest insufficient to exercise control over the corporation. And although we find respondent's argument persuasive, in that a holder of a one-third interest in a California corporation *588 is protected under California corporate law, the right to force a liquidation is not unfettered; grounds are required. Cal. Corp. Code sec. 2004 (West Supp. 1994). Thus, although we believe that a potential investor would apply some discount to a one-third interest in Dune Lakes, Ltd., for lack of control, we believe the safeguards afforded under California corporate law would mitigate the impact. Based on all the facts and circumstances in the record before us, we believe that a minority position discount of 20 percent would be appropriate. Combining the lack of marketability discount of 15 percent and the minority discount of 20 percent to the stipulated value of the real estate of $ 1,600,000, we hold that the fair market value of petitioner's one-third interest in Dune Lakes, Ltd., on the valuation date was $ 1,040,000. Issue 3. Value of 41.9-Percent Interest in Miramonte Liquidating Trust
Petitioner claims that the value of its interest in the Miramonte Liquidating Trust on the valuation date was $ 2,150,000. Respondent, after concessions, claims that the value was $ 3,250,000. Both petitioner and respondent, as well as their experts, are in agreement that the *589 value of the trust units depended on the value of the note held by the trust and issued by Shamrock. Petitioner's expert, Mr. Moore, analyzed the financial condition of Shamrock and the terms of the note, and concluded that the note should be rated at below "investment grade". He examined the current yields of bonds of similar grade and concluded that the note should yield 13.5 percent. He discounted the value of the underlying note by 10 percent to reflect that the note was held by a private liquidating trust and that the interest in the trust was subject to restrictions on transferability. The 10-percent discount also reflected the fact that petitioner's interest was a minority interest with no power to force the trustees to liquidate the note. Petitioner also asserts that if the Court determines that Mr. Moore's opinion of fair market value is not accepted, then, in the alternative, Dr. Pratt's opinion should be accepted. Based on his review of Shamrock's financial position, the terms of the note, the potential liabilities of the trust, and bonds issued by publicly traded companies with key ratios similar to Shamrock's, Dr. Pratt rated the note at below investment grade. *590 He concluded that the note would have to generate a yield to maturity of 15 percent to attract potential investors. In addition, based on his analysis of the comparables he determined that a 5-percent discount was in order as well as a 10-percent discount to reflect the lack of marketability associated with the trust units. Respondent argues that based on Shamrock's financial position only a 10-percent discount was in order. Factors such as significant gains in 1987, Shamrock's history of payments on the note, and a $ 30 million line of credit at one-half of 1 percent above prime indicated that Shamrock had a good credit rating and was a good risk. Respondent argues against any discount for lack of marketability because (1) the 10-percent discount computed above is, in part, a marketability discount, (2) the trust units being valued represent a substantial interest in the trust, and (3) the trust has a limited life, and the rights and benefits of the unit holders are definite and ascertainable. Thus, there is less risk of illiquidity. Similarly, respondent argues against the application of a minority discount, citing 2 Scott & Fratcher, The Law of Trusts, secs. 128.2, 129, 130 *591 (4th ed. 1987): [in contrast to a minority shareholder in a closely held corporation,] a trust beneficiary has both a proprietary interest in and equitable title to the trust property. The beneficiary has rights against third parties in relation to the trust interest; the nature and extent of the beneficiary's interest is definite and ascertainable upon the creation of the trust; and the economic benefits and rights of ownership cannot be affected under the trust instrument. Since the trustee's relationship to the beneficiary is that of a fiduciary, the trustee must adhere to the terms of the trust and act solely for the benefit of the beneficiary. Id.
Respondent argues that control and management of investment are not factors considered in the valuation of a beneficial interest in a trust. Respondent then subtracted the present value of $ 10,500 of annual trust expenses in arriving at the fair market value of the trust units. For purposes of estate tax valuation, the fair market value of notes, secured or unsecured, is presumed to be the amount of unpaid principal, plus interest accrued to the date of death, unless the executor establishes that the value is lower *592 or that the notes are worthless. Sec. 20.2031-4, Estate Tax Regs. The burden of proof is on the taxpayer to submit satisfactory evidence that the note is worth less than the face value plus accrued interest (e.g., because of the interest rate, date of maturity, or other cause). Estate of Pittard v. Commissioner, 69 T.C. 391 (1977); Scher v. United States, 39 AFTR 2d 77-1580, 76-2 USTC par. 13163 (D.N.J. 1976); Sec. 20.2031-4, Estate Tax Regs.; see Estate of Berkman v. Commissioner, T.C. Memo. 1979-46 (taking into account low rate of interest, together with the lack of security and the considerable length of time until maturity, the Court concluded that the notes were includable in the decedent's gross estate at their fair market value and not at their face amount). In analyzing the fair market value of notes we have considered the ability of the debtor to repay the notes. Estate of Pittard v. Commissioner, supra; Estate of Burr v. Commissioner, a Memorandum Opinion of this Court dated Nov. 27, 1945; see also Whitlow v. Commissioner, 82 F.2d 569, 574 (8th Cir. 1936) *593 ("the main factor in so determining the value of these notes would be the probability of their being paid when due"), affg. 30 B.T.A. 1465 (1934). Moreover, another court has held that notes should be valued at face value at date of death even though the maker may have been insolvent at that time. Scher v. United States, supra.In so holding, the court determined that at the time of valuation, from all that could be known in the market, there was every reasonable expectation that the notes would be paid when due. Id. Similar notes were being issued to ready lenders; interest on outstanding obligations was being paid; notes due at or about this time were honored when presented for payment, and the debtor was still considered sound by the financial community. Fair Market Value of the Note
Based on Shamrock's never missing a payment on the note from its inception in 1984 until valuation date of October 27, 1987, Shamrock's net book value of approximately $ 83 million, [10] the reputation of its principal shareholder, Roy Disney, and its ability to obtain bank financing, respondent argues that Shamrock *594 was a relatively good credit risk. Petitioner presents a number of arguments why we should view Shamrock as a credit risk. Petitioner contends that Shamrock's gains in 1987 were one-time sales of assets and not income from operating revenues and thereby distort the company's financial position. We find no merit to this argument. Shamrock's financial statements reflect approximately $ 62.8 million in net income for the year ended December 31, 1987. If we subtract out the "gain on sale of discontinued operations" of approximately $ 45.7 million, Shamrock would still have over $ 17 million net income for the year. In addition, the financial statements for the year ended December 31, 1986 reflect approximately $ 10.3 million net income. Next, petitioner would have us believe that Shamrock was a credit risk because the note was not collateralized. While this is true, we *595 believe that Shamrock's net assets, history of repayment, and overall financial condition (which was sufficient security for obtaining other unsecured borrowing, including bank advances in excess of $ 30 million at around prime rate) constituted evidence of Shamrock's creditworthiness. Finally, petitioner would have us discount the note based on the value of comparable publicly traded investments. Petitioner's expert used as a comparable a company involved in television broadcasting; however, the company had reported deficits of $ 131 million and $ 187 million in 1987 and 1986, respectively. As we have stated before, we will reject comparables if the dissimilarities so warrant. Estate of Hall v. Commissioner, 92 T.C. 312 (1989); Northern Trust Co. v. Commissioner, 87 T.C. at 377. Accordingly, we sustain respondent's disallowance of discounting the note. However, our analysis does not end because the note is privately held in a liquidating trust. Accordingly, we must analyze the applicability of discounts for lack of marketability and minority interest. Lack of Marketability
As we have discussed above, the lack *596 of marketability discount is designed to reflect the fact that there is no ready market for shares in a closely held corporation. Estate of Andrews v. Commissioner, 79 T.C. at 953. Assuming the principle applies to the trust units at issue, we hold that a discount is not appropriate. We have held that a discount is not warranted where the assets consist solely of liquid assets. Estate of Jephson v. Commissioner, 87 T.C. 297 (1986). In the instant case, the terms of the trust call for a distribution by the trustees within 60 days after receipt of payment on the note. The trust has a definite term, set to expire no later than January 31, 1997, a date 31 days after the last payment is due on the note. Furthermore, the trustees had no authority to conduct a trade or business, or to invest trust funds other than in interest-bearing accounts or short-term interest-bearing investments. We also believe that the right of first refusal has no effect on the marketability of the trust units. We note that a commodity freely salable is obviously worth more on the market than a precisely similar commodity which cannot be freely *597 sold. Worcester County Trust Co. v. Commissioner, 134 F.2d 578 (1st Cir. 1943), revg. and remanding Estate of Smith v. Commissioner, 46 B.T.A. 337 (1942); Estate of Johnson v. Commissioner, 77 T.C. 120 (1981), revd. on other grounds 718 F.2d 1303 (5th Cir. 1983); Estate of Reynolds v. Commissioner, 55 T.C. 172 (1970). However, we have held that a right of first refusal without a fixed price will have little, if any, effect on fair market value and clearly will have a less drastic effect than fixed-price restrictions. Estate of Cotchett v. Commissioner, T.C. Memo. 1974-31. Although the restriction in the instant case restricts the field of available purchasers in the first instance, it does not affect marketability because the price is not fixed. Respondent has provided for a 10-percent discount to account for a lack of marketability. Petitioner has not persuaded us that any additional amount is appropriate. We sustain respondent's disallowance of petitioner's discount and uphold her 10-percent discount *598 for lack of marketability. Minority Interest Discount
Petitioner's sole contention is that a holder of the trust units has no power to force the trustees to liquidate the note. Respondent argues that since the trustee's relationship to the beneficiary is that of a fiduciary, the trustee must adhere to the terms of the trust and act solely for the benefit of the beneficiary. Pursuant to the trust agreement, and Cal. Prob. Code secs. 16008(a) and 16040 (Deering 1994), the trustees had a duty to dispose of any trust assets included at the time of creation of the trust that would not be a proper investment for the trustee to make. The trustees had to exercise their powers, including the power to sell the note, according to the "prudent man standard." And if the trustees breached their fiduciary duty to the beneficiaries by not selling the note, any beneficiary could sue to force the sale of the note. Cal. Prob. Code sec. 16420 (Deering 1994). We find respondent's argument persuasive and hold that a discount for minority interest was inappropriate. We sustain respondent that the fair market value of petitioner's 41.9-percent interest in the Miramonte Trust was $ 3,250,000 on *599 the valuation date. Issue 4. Addition to Tax for Valuation Understatement
Respondent determined an addition to tax under section 6660. Respondent contends that petitioner did not have a reasonable basis for the valuation claimed on its tax return for Dune Lakes, Ltd., and RSJ, Inc. Petitioner contends that there should be no addition to tax because: (1) There was a reasonable basis for the estate tax return value; (2) petitioner claimed the value in good faith; and (3) respondent abused her discretion in failing to waive the addition. Section 6660(a) provides that in the case of an underpayment of a tax imposed by subtitle B (relating to estate and gift taxes) which is attributable to a valuation understatement, there shall be added to the tax an amount equal to the applicable percentage of the underpayment so attributed. There is a valuation understatement if the value of any property claimed on any return is 66-2/3 percent or less of the amount determined to be the correct amount of such valuation. Sec. 6660(c). If the valuation claimed is (1) 50 percent or more, but not more than 66-2/3 percent, of the correct valuation, the applicable percentage is 10 percent; (2) *600 40 percent or more but less than 50 percent, the applicable percentage is 20 percent, and (3) less than 40 percent, the applicable percentage is 30 percent. Sec. 6660(b). The section does not apply if the underpayment is less than $ 1,000. Sec. 6660(d). The Secretary may waive all or any part of the addition to tax provided by section 6660 on a showing by the taxpayer that there was a reasonable basis for the valuation claimed on the return and that such claim was made in good faith. Sec. 6660(e). In the instant case there is an underpayment of estate tax attributable to a valuation understatement, and the underpayment is at least $ 1,000 of the estate tax imposed. The value of the 78-percent stock interest in RSJ, Inc., claimed by petitioner on its estate tax return is approximately 50.6 percent of the correct valuation, as redetermined by this Court. Thus, the applicable percentage is 10 percent of the resulting underpayment. The value of the one-third stock interest in Dune Lakes, Ltd., claimed by petitioner on its estate tax return is approximately 44.7 percent of the correct valuation, as redetermined by this Court. Thus, the applicable percentage is 20 percent of the *601 attributable underpayment. We must now consider whether the addition to tax should be waived. The denial of a waiver by the Secretary is reviewable by this Court on an abuse-of-discretion basis. Mailman v. Commissioner, 91 T.C. 1079, 1082-1084 (1988). The burden of proof is on petitioner. Rule 142; Mailman v. Commissioner, supra.
We believe petitioner exercised good faith in determining the values reported in its estate tax return. The coexecutors sought professional advice and obtained the services of an experienced lawyer to prepare the estate tax return and experts to appraise the value of the stock and the underlying assets in the corporation. Respondent challenges the reasonableness of petitioner in relying on these professionals and the values determined. As we have noted in the past, this is a more difficult question. Estate of Jung v. Commissioner, 101 T.C. at 450. Mr. Moore undervalued petitioner's stock interests, as reported on the tax return, by approximately 45-50 percent from what we determined to be the correct value. His valuations were undervalued by 57 percent *602 and 68 percent respectively, when compared to respondent's valuation. Therefore, we did not place a great deal of weight on his valuations. However, his analysis and conclusions were based on his extensive experience as an appraiser. His report, although not helpful for purposes of assisting the Court in determining the value of petitioner's interests, does give some explanation of his conclusion, analysis, and process. Furthermore, we have recognized that valuation is not a precise science. Messing v. Commissioner, 48 T.C. at 512. We find that petitioner reasonably relied on professional advice and expert appraisals. Although we disagree with their conclusions, we believe petitioner's experts acted reasonably and in good faith in determining fair market value. Thus, we do not sustain respondent's determination of an addition to tax under section 6660. To reflect the foregoing and concessions by the parties, Decision will be entered under Rule 155.
Footnotes
1. All section references are to the Internal Revenue Code in effect as of the date of decedent's death, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated.↩
2. Petitioner made a valid election under sec. 2032 to value the assets of the estate on the alternate valuation date of Oct. 27, 1987.↩
3. The record does not indicate the relationship of Mr. Herdman to decedent.↩
4. Decedent received all of the stock owned by Nancy L. Luton, who had predeceased him in September of 1983.↩
5. As of Apr. 27, 1987, the other shares of Dune Lakes, Ltd. were owned by Nancy Luton's brother, Mr. William Dickinson (1 share), Nancy Luton's niece, Martha May (one-half share), and decedent's son-in-law, Mr. Peter Jackson (one-half share).↩
6. In addition, we have recognized that Commissioner's Rev. Rul. 59-60, 1959-1 C.B. 237, which both parties' experts have relied upon, has been widely accepted as setting forth the appropriate criteria to consider in determining fair market value of stock of closely held corporations for estate tax purposes. Estate of Newhouse v. Commissioner, 94 T.C. 193, 217 (1990). The revenue ruling recognizes that a determination of fair market value is a question of fact and will depend upon the circumstances of each case: No formula can be devised that will be generally applicable to the multitude of different valuation issues arising in estate and gift tax cases. Often an appraiser will find wide differences of opinion as to the fair market value of a particular stock. In resolving such differences, * * * [the appraiser] should maintain a reasonable attitude in recognition of the fact that valuation is not an exact science. A sound valuation will be based upon all the relevant facts, but the elements of common sense, informed judgment and reasonableness must enter into the process of weighing those facts and determining their aggregate significance. [ Rev. Rul. 59-60, 1959-1 C.B. at 238↩.]
7. Mr. Moore testified that if he were to use the stipulated value of the real estate (i.e., $ 7,200,000), the value of RSJ Inc., would be $ 2,900,000. If he used $ 6,200,000 ($ 7,200,000 less $ 1 million discount), the value would be $ 2,500,000.↩
8. At trial, Mr. Moore testified that if one assumed that the value of the real estate of Dune Lakes was $ 4,800,000 on the alternate valuation date (the value stipulated to in the partial agreement), then the fair market value of petitioner's one-third interest would be $ 505,000.↩
9. Pursuant to the repeal of the "General Utilities doctrine" by the 1986 Act, certain transition rules were enacted that allowed certain corporations, including Dune Lakes, Ltd., to liquidate under the old law before Jan. 1, 1989. See Tax Reform Act of 1986, Pub. L. 99-514, sec. 633(d), 100 Stat. 2085, 2278. Again we note that a purchaser would have to wait 14 months to liquidate without incurring a corporate capital gains tax; however, we will consider this fact in the lack of marketability discount.↩
10. Per Shamrock's financial statements for year ended Dec. 31, 1987, assets totaled $ 252,311 million and liabilities totaled $ 169,089 million.↩