110 T.C. No. 35


UNITED STATES TAX COURT


ESTATE OF ARTEMUS D. DAVIS, DECEASED, ROBERT D. DAVIS,
PERSONAL REPRESENTATIVE, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 9337-96.                    Filed June 30, 1998.


        <u>Held</u>: In determining the fair market value on a
valuation date after the repeal of the doctrine
established in <u>General Utils. & Operating Co. v.</u>
<u>Helvering</u>, 296 U.S. 200 (1935), of each of two minority
blocks of common stock of company A, the Court is not
precluded on the record presented from giving
consideration to A's built-in capital gains tax as of
that date of about $26.7 million. <u>Held</u>, <u>further</u>, the
fair market value on the valuation date of each block
of stock at issue is $10,338,725, determined by first
ascertaining A's net asset value on that date without
regard to any discount or adjustment attributable to
blockage and/or 17 C.F.R. sec. 230.144 (1992) or A's
built-in capital gains tax, reducing that value by a
15-percent minority discount to which the parties
agree, and reducing the resulting value by a lack-of-
marketability discount of $28 million which the Court
arrived at by giving consideration to, inter alia, A's
built-in capital gains tax and including as part of
that discount $9 million attributable to such tax.

Gregory V. Nelson, John W. Porter, and Richard A. Husseini, for petitioner.

Victoria J. Sherlock, Norman N. Pickett, and Harve M. Lewis, for respondent.

CHIECHI, Judge: Respondent determined a deficiency of $5,283,894 in the Federal gift tax of Artemus D. Davis (decedent) who died on June 11, 1995, after he made the two gifts to which that deficiency pertains. The sole issue for decision is the fair market value on November 2, 1992, of each of two blocks of 25 shares of common stock of A.D.D. Investment and Cattle Company (ADDI&C), one of which decedent gave to his son Robert D. Davis (Robert Davis) and the other of which decedent gave to his son Lee W. Davis (Lee Davis).

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found.

Decedent, who was one of the founders of Winn-Dixie Stores, Inc. (Winn-Dixie), died testate on June 11, 1995, while he was a legal resident of Florida. Robert Davis, the personal representative of decedent's estate, resided in Jacksonville, Florida, at the time the petition was filed.

On or about November 2, 1992 (the valuation date), ADDI&C, a closely held Florida corporation that was incorporated on December 22, 1947, had a total of 97 shares of common stock issued and outstanding, all of which were owned by a trust (Davis

trust) for the benefit of decedent and none of which was subject to any restrictive sale provisions or buy-sell agreements. On the valuation date, decedent transferred 25 shares of such stock to his son Robert Davis and 25 shares of such stock to his son Lee Davis. On that date, each of those two blocks of ADDI&C common stock constituted 25.77 percent of the issued and outstanding common stock of ADDI&C.

As of the valuation date, ADDI&C was primarily a holding company for various assets of decedent, although ADDI&C also had certain cattle operations (both feeder and breeding cattle) as of that date. Specifically, on the valuation date, ADDI&C owned 1,020,666 shares, or 1.328 percent, of the issued and outstanding common stock of Winn-Dixie, which was at all relevant times traded on the New York Stock Exchange (NYSE); 3,456 shares, or .0737 percent, of the issued and outstanding common stock of D.D.I., Inc. (DDI), which was a holding company for various assets of decedent and his family and the stock of which was at all relevant times not publicly traded; various feeder and breeding cattle; certain equipment; and certain other unidentified assets.

As of the valuation date, ADDI&C's management group consisted of the following individuals who were serving in the positions indicated: Artemus D. Davis, chairman of the board of directors, president, and director; James E. Davis, executive

vice president and director; Robert Davis, vice president, assistant secretary, and director; H. J. Skelton, vice president, treasurer, and director; Harry D. Francis, vice president and assistant secretary; and G. P. Bishop, Jr., secretary and assistant treasurer.

On or before the valuation date, decedent, James E. Davis, and Robert Davis were directors of Winn-Dixie.  For the 12-month period prior to the valuation date, the average daily trading volume of Winn-Dixie stock was 47,400 shares.  For the 4-week period prior to the valuation date, the average weekly trading volume of Winn-Dixie stock was 310,675 shares.

As of the valuation date, decedent, ADDI&C, and the Davis trust were affiliates within the meaning and for purposes of 17 C.F.R. sec. 230.144 (1992)[1] with respect to the sale of Winn-Dixie stock.  Pursuant to SEC rule 144, shares of Winn-Dixie stock held by affiliates were subject to certain restrictions, including restrictions on the sale of such shares prescribed by SEC rule 144(e)(1).

ADDI&C received the following dividends during its fiscal years ended October 31, 1988, 1989, 1990, 1991, and 1992:

---

[1]  We shall refer to 17 C.F.R. sec. 230.144 (1992), which was promulgated by the Securities and Exchange Commission (SEC), as SEC rule 144.  All references to SEC rule 144 are to the Code of Federal Regulations in effect on the valuation date.

| Fiscal Year Ended October 31 | Dividends Received |
|---|---|
| 1988 | $888,330 |
| 1989 | 996,584 |
| 1990 | 1,044,926 |
| 1991 | 1,145,370 |
| 1992 | 1,272,699 |

Over $1.2 million of the dividends that ADDI&C received during its fiscal year ended October 31, 1992, were dividends received on the Winn-Dixie stock that it owned.

DDI declared and paid dividends with respect to all of its issued and outstanding stock, including the shares of such stock owned by ADDI&C, in the following aggregate amounts during its fiscal years ended November 30, 1989, 1990, 1991, 1992:

| Fiscal Year Ended November 30 | Aggregate Dividends Paid |
|---|---|
| 1989 | $21,093,694 |
| 1990 | 21,796,815 |
| 1991 | 23,437,435 |
| 1992 | 23,906,184 |

Subject to the caveats stated below, the following table shows as of the valuation date ADDI&C's assets and liabilities, the historical cost basis and the fair market value of each such asset, and ADDI&C's net asset value:

| Asset | Historical Cost Basis | Fair Market Value |
|---|---|---|
| Feeder cattle, cost | $6,474,368 | $8,074,368 |
| Breeding herd, net | 1,072,843 | 1,894,400 |
| Winn-Dixie stock | 338,283 | 70,043,204 |
| DDI stock | 120,263 | 535,162 |
| Total equipment, net | 172,999 | 130,294 |
| Other assets | 1,295,539 | 1,295,539 |
| Total assets | 9,474,295 | 81,972,967 |
| Total liabilities | 1,832,698 | 1,832,698 |
| Net asset value | 7,641,597 | 80,140,269 |

The fair market value of ADDI&C's Winn-Dixie stock and its net asset value that are shown in the foregoing table do not reflect any type of discount or adjustment with respect to that stock which is attributable to blockage and/or SEC rule 144 (blockage and/or SEC rule 144 discount). Nor do the fair market value of each of ADDI&C's assets and its net asset value that are shown in the foregoing table reflect any type of discount or adjustment which is attributable to, inter alia, lack of a controlling interest, lack of marketability, or the Federal and State income tax (ADDI&C's built-in capital gains tax) that ADDI&C would have incurred at a combined tax rate of 37.63 percent on the gains as of the valuation date on ADDI&C's assets (i.e., the difference between the historical cost basis and the fair market value of each of its assets, hereinafter referred to as ADDI&C's built-in-

capital gains) if on that date each such asset had been sold or otherwise disposed of or ADDI&C had liquidated.

During 1990, ADDI&C paid $252,602 to an affiliated company as reimbursement for the use of an airplane by one of its shareholders. For Federal income tax purposes, ADDI&C reported that payment as a shareholder dividend. With the exception of that dividend, ADDI&C has not declared or paid any dividends to its shareholders.

On the valuation date, ADDI&C had not adopted a formal plan of liquidation, nor was there any intention by that corporation or decedent to liquidate ADDI&C or to dispose of its Winn-Dixie stock.

On October 31, 1992, ADDI&C's net operating loss carry-forwards totaled $1,580,217.

On or about April 15, 1993, decedent timely filed for 1992 Form 709, United States Gift (and Generation-Skipping Transfer) Tax Return (gift tax return). In that return, decedent reported that the value on the valuation date of each of the two 25-share blocks of ADDI&C stock that he transferred to his sons was $7,444,250, or $297,770 a share. The value reported by decedent in the gift tax return was based on an appraisal by Alex W. Howard (Mr. Howard) of Howard Frazier Barker Elliott, Inc. (Mr. Howard's appraisal).

Respondent determined in the notice of deficiency (notice) that on the valuation date the fair market value of each of the

two 25-share blocks of ADDI&C stock that decedent transferred to his sons was $12,046,975, or $481,879 a share.

## OPINION

Petitioner modified the position reflected in decedent's gift tax return as to the value on the valuation date of each of the two blocks of stock in question and now claims that the fair market value of each of those blocks on that date was $6,904,886, or $276,195 per share. Respondent modified the determination in the notice as to that value and now contends that the fair market value on the valuation date of each of the two blocks of ADDI&C stock in question was $13,518,500, or $540,740 per share.[2]

If a gift is made in property, its value at the date of the gift is considered the amount of the gift. Sec. 2512(a);[3] sec. 25.2512-1, Gift Tax Regs. The value of the property for Federal gift tax purposes is

> the price at which such property would change hands
> between a willing buyer and a willing seller, neither
> being under any compulsion to buy or to sell, and both
> having reasonable knowledge of relevant facts. * * * All
> relevant facts and elements of value as of the time of
> the gift shall be considered. * * * [Sec. 25.2512-1,
> Gift Tax Regs.]

The willing buyer and the willing seller are hypothetical persons, rather than specific individuals or entities, and the individual

---

[2] Respondent is not, however, claiming an increased gift tax deficiency.

[3] All section references are to the Internal Revenue Code in effect on the valuation date. Unless otherwise indicated, all Rule references are to the Tax Court Rules of Practice and Procedure.

characteristics of these hypothetical persons are not necessarily the same as the individual characteristics of the actual seller or the actual buyer.  Estate of Curry v. United States, 706 F.2d 1424, 1428, 1431 (7th Cir. 1983); Estate of Bright v. United States, 658 F.2d 999, 1005-1006 (5th Cir. 1981).  The hypothetical willing buyer and the hypothetical willing seller are presumed to be dedicated to achieving the maximum economic advantage.  Estate of Curry v. United States, supra at 1428; Estate of Newhouse v. Commissioner, 94 T.C. 193, 218 (1990).

In the case of unlisted stock, like the ADDI&C stock in question, the price at which sales of stock are made in arm's-length transactions in an open market is the best evidence of its value.  Champion v. Commissioner, 303 F.2d 887, 893 (5th Cir. 1962), revg. and remanding T.C. Memo. 1960-51.  In the instant case, the record does not disclose any such sales of ADDI&C stock.

Where the value of unlisted stock cannot be determined from actual sale prices, its value generally is to be determined by taking into consideration the company's net worth, prospective earning power, and dividend-paying capacity, as well as other relevant factors, including the company's good will, its position in the industry, its management, the degree of control of the business represented by the block of stock to be valued, and the values of securities of corporations engaged in the same or similar lines of business that are listed on a stock exchange.  Sec. 25.2512-2(f)(2), Gift Tax Regs.  Section 4 of Rev. Rul. 59-

60, 1959-1 C.B. 237, 238-242, sets forth criteria that are virtually identical to those listed in section 25.2512-2(f)(2), Gift Tax Regs., and "has been widely accepted as setting forth the appropriate criteria to consider in determining fair market value". Estate of Newhouse v. Commissioner, supra at 217. Section 5 of Rev. Rul. 59-60, 1959-1 C.B. at 242-243, which addresses the determination of the fair market value of the stock of a closely held investment company, provides in pertinent part:

> (b) The value of the stock of a closely held investment or real estate holding company, whether or not family owned, is closely related to the value of the assets underlying the stock. For companies of this type the appraiser should determine the fair market values of the assets of the company. Operating expenses of such a company and the cost of liquidating it, if any, merit consideration when appraising the relative values of the stock and the underlying assets. The market values of the underlying assets give due weight to potential earnings and dividends of the particular items of property underlying the stock, capitalized at rates deemed proper by the investing public at the date of appraisal. A current appraisal by the investing public should be superior to the retrospective opinion of an individual. For these reasons, adjusted net worth should be accorded greater weight in valuing the stock of a closely held investment or real estate holding company, whether or not family owned, than any of the other customary yardsticks of appraisal, such as earnings and dividend paying capacity.

There is no fixed formula for applying the factors that are to be considered in determining the fair market value of unlisted stock. See Estate of Goodall v. Commissioner, 391 F.2d 775, 786 (8th Cir. 1968), vacating and remanding T.C. Memo. 1965-154. The weight to be given to the various factors in arriving at fair market value depends upon the facts of each case. Sec. 25.2512-

2(f), Gift Tax Regs.  As the trier of fact, we have broad discretion in assigning the weight to accord to the various factors and in selecting the method of valuation.  Estate of O'Connell v. Commissioner, 640 F.2d 249, 251-252 (9th Cir. 1981), affg. on this issue and revg. in part T.C. Memo. 1978-191; sec. 25.2512-2(f), Gift Tax Regs.

The determination of the value of closely held stock, like each of the two 25-share blocks of ADDI&C stock at issue, is a matter of judgment, rather than of mathematics.  Hamm v. Commissioner, 325 F.2d 934, 940 (8th Cir. 1963), affg. T.C. Memo. 1961-347.  Moreover, since valuation is necessarily an approximation, it is not required that the value that we determine be one as to which there is specific testimony, provided that it is within the range of figures that properly may be deduced from the evidence.  Silverman v. Commissioner, 538 F.2d 927, 933 (2d Cir. 1976), affg. T.C. Memo. 1974-285; Anderson v. Commissioner, 250 F.2d 242, 249 (5th Cir. 1957), affg. in part and remanding in part T.C. Memo. 1956-178.

As is customary in valuation cases, the parties rely extensively on the opinions of their respective experts to support their differing views about the fair market value on the valuation date of each of the two 25-share blocks of ADDI&C stock in question.  The estate relies on (1) Mr. Howard, who is an accredited senior appraiser of the American Society of Appraisers and a principal in the business valuation firm of Howard Frazier

Barker Elliott, Inc., and (2) Shannon Pratt (Mr. Pratt), who is an accredited senior appraiser and fellow of the American Society of Appraisers and a founder and managing director of the business valuation firm of Willamette Management Associates. Respondent relies on John A. Thomson (Mr. Thomson), who is an accredited senior appraiser of the American Society of Appraisers and a vice president and the managing director of the Long Beach, California, office of the business valuation firm of Klaris, Thomson & Schroeder, Inc. Each of the experts prepared an initial expert report (expert report)[4] and a rebuttal expert report (rebuttal report).[5]

We evaluate the opinions of experts in light of the demonstrated qualifications of each expert and all other evidence in the record. Anderson v. Commissioner, supra at 249; Parker v. Commissioner, 86 T.C. 547, 561 (1986). We have broad discretion to evaluate "'the overall cogency of each expert's analysis.'" Sammons v. Commissioner, 838 F.2d 330, 334 (9th Cir. 1988)(quoting Ebben v. Commissioner, 783 F.2d 906, 909 (9th Cir. 1986), affg. in part and revg. in part T.C. Memo. 1983-200), affg. in part and

---

[4] The expert report of petitioner's expert Mr. Howard is identical to Mr. Howard's appraisal on which the value reported in the gift tax return for each of the two gifts in question was based. Hereinafter, we shall refer to Mr. Howard's appraisal as his expert report.

[5] Each of petitioner's experts prepared a rebuttal report with respect to the expert report of respondent's expert, and respondent's expert prepared separate rebuttal reports with respect to the expert reports of petitioner's two experts.

revg. in part T.C. Memo. 1986-318.  We are not bound by the formulae and opinions proffered by expert witnesses, especially when they are contrary to our judgment.  Silverman v. Commissioner, supra; IT&S of Iowa, Inc. v. Commissioner, 97 T.C. 496, 508 (1991). Instead, we may reach a determination of value based on our own examination of the evidence in the record. Lukens v. Commissioner, 945 F.2d 92, 96 (5th Cir. 1991)(citing Silverman v. Commissioner, supra at 933), affg. Ames v. Commissioner, T.C. Memo. 1990-87.  The persuasiveness of an expert's opinion depends largely upon the disclosed facts on which it is based.  See Tripp v. Commissioner, 337 F.2d 432, 434 (7th Cir. 1964), affg. T.C. Memo. 1963-244.  Where experts offer divergent estimates of fair market value, we shall decide what weight to give those estimates by examining the factors used by those experts to arrive at their conclusions.  Casey v. Commissioner, 38 T.C. 357, 381 (1962).  While we may accept the opinion of an expert in its entirety, Buffalo Tool & Die Manufacturing Co. v. Commissioner, 74 T.C. 441, 452 (1980), we may be selective in the use of any part of such an opinion, Parker v. Commissioner, supra at 562.  We also may reject the opinion of an expert witness in its entirety.  Palmer v. Commissioner, 523 F.2d 1308, 1310 (8th Cir. 1975), affg. 62 T.C. 684 (1974); Parker v. Commissioner, supra at 562.

For convenience, the following chart (chart) shows the respective positions of the experts[6] and the parties on brief with respect to the net asset value of ADDI&C on the valuation date and the discounts or adjustments that each believes should be applied to such value in order to arrive at the fair market value on that date of each of the two 25-share blocks of ADDI&C stock in question:[7]

---

[6] The respective positions of the experts that are shown in the chart reflect the agreement of the parties as to the fair market value of each of ADDI&C's assets and the aggregate amount of its liabilities as of the valuation date without taking into account any type of discount or adjustment attributable to blockage and/or SEC rule 144, lack of a controlling interest, lack of marketability, or ADDI&C's built-in capital gains tax. However, those positions do not reflect the agreement of the parties at trial that the applicable minority discount should be 15 percent. Despite that agreement, the respective dollar amounts of a 15-percent minority discount urged on brief by petitioner and by respondent differ. That is because of the differences between them as to whether a blockage and/or SEC rule 144 discount and a discount or adjustment attributable to ADDI&C's built-in capital gains tax should be taken into account in arriving at ADDI&C's net asset value on the valuation date.

[7] All dollar amounts in the chart are rounded to the nearest dollar.

| | Petitioner's Expert Mr. Howard | Petitioner's Expert Mr. Pratt | Respondent's Expert Mr. Thomson | Petitioner[1] | Respondent |
|---|---|---|---|---|---|
| Blockage and/or SEC rule 144 discount | 4.9 percent or $3,432,117 | 10 percent or $7,004,320 | -$0- | 10 percent or $7,004,320 | -$0- |
| Discount or adjustment attributable to ADDI&C's built-in capital gains tax | 25,395,109 | Factored in as part of lack-of-marketability discount | Factored in as part of lack-of-marketability discount | 24,645,525 | -0- |
| Net asset value of ADDI&C | 51,313,043 | 73,135,976 | 80,140,269 | 49,490,424 | 80,140,269 |
| Minority discount | 15 percent or 7,696,956 | 20 percent or 14,627,195 | 12 percent or 9,616,832 | 15 percent or 7,273,564 | 15 percent or 12,021,040 |
| Lack-of-marketability discount | 35 percent or 15,265,630 | 50 percent or 29,254,391 | 38 percent or 26,798,906 | 35 percent or 14,425,901 | 23 percent or 15,667,423 |
| Portion of lack-of-marketability discount attributable to ADDI&C's built-in capital gains tax | -0- | 15 percent or 8,776,317 | 15 percent or 10,578,516 | -0- | -0- |
| Total dollar amount of discounts or adjustments | 51,789,812 | 50,885,906 | 36,415,738 | 53,349,310 | 27,688,463 |
| Fair market value of each 25-share block of ADDI&C common stock | 7,306,825 | 7,539,800 | 11,250,000 | 6,904,886 | 13,518,500 |
| Fair market value of each share of each 25-share block of ADDI&C common stock | 292,273 | 301,592 | 450,000 | 276,195 | 540,740 |

[1] This column reflects petitioner's position on brief regarding all of the items reflected in the chart except for ADDI&C's net asset value.  The Court had to calculate petitioner's position with respect to the amount of ADDI&C's net asset value because nowhere on brief does petitioner state what that figure should be.  The Court calculated petitioner's position as to that amount, which is shown in the chart, based on petitioner's contentions that a 10-percent blockage and/or SEC rule 144 discount on the NYSE price of ADDI&C's Winn-Dixie stock (viz., $7,004,320) and a discount or adjustment equal to the full amount of ADDI&C's built-in capital gains tax, which petitioner calculates to be $24,645,525, should be applied in determining ADDI&C's net asset value on the valuation date.  Even assuming arguendo that petitioner's contentions regarding a blockage and/or SEC rule 144 discount and a discount or adjustment for the full amount of ADDI&C's built-in capital gains tax were correct, we believe that petitioner erroneously calculated the amount of that tax to be $24,645,525.  It appears that in calculating that amount petitioner improperly failed to take into account the $1,580,217 of net operating loss carryforwards that ADDI&C had as of Oct. 31, 1992.  That error had a domino effect; as a result, the dollar amounts of the minority and the lack-of-marketability discounts that petitioner advocates are slightly less than they would have been if petitioner had not made that error.

The parties and all of the experts agree that the initial step in ascertaining the fair market value on the valuation date of each of the two 25-share blocks in question is to determine as of that date the fair market value of each of ADDI&C's assets and the aggregate amount of its liabilities in order to calculate its net asset value on that date. All of them also are in agreement that, without taking into account any discounts or adjustments (including but not limited to a blockage and/or SEC rule 144 discount, a minority discount for lack of a controlling interest, a lack-of-marketability discount, and a discount or adjustment attributable to ADDI&C's built-in capital gains tax), on the valuation date the aggregate fair market value of ADDI&C's assets was $81,972,967, its liabilities totaled $1,832,698, and its net asset value was $80,140,269.

Petitioner and petitioner's experts agree that, in determining the fair market value of ADDI&C's Winn-Dixie stock and its net asset value on the valuation date, it is necessary to reduce the fair market value of that stock and ADDI&C's net asset value to which the parties in this case have stipulated by applying a blockage and/or SEC rule 144 discount to that stock. Petitioner and petitioner's expert Mr. Pratt believe that a blockage and/or SEC rule 144 discount of 10 percent is proper, and petitioner's expert Mr. Howard concludes that such a discount of

4.9 percent is appropriate.[8]  Respondent and respondent's expert maintain that no blockage and/or SEC rule 144 discount is warranted.

The parties and their experts agree that the Winn-Dixie stock held by ADDI&C on the valuation date was subject to the volume limitation on the sale of that stock prescribed by SEC rule 144(e)(1) (SEC rule 144(e)(1) volume limitation).  That rule limited the amount of restricted or other securities that could have been sold by an affiliate during a given 3-month period generally to the greater of (a) one percent of the shares of the outstanding class of stock or (b) the average weekly reported trading volume during the 4-week period preceding the filing of a notice of proposed sale which was required under SEC rule 144(h).

The parties and their respective experts also are in agreement that as of the valuation date there were two ways in which ADDI&C could have disposed of its Winn-Dixie stock.  One such method was for ADDI&C to have sold its entire block of that stock in a private placement to a nonaffiliated investor.  Unless that block of stock were registered, that investor would have been subject to a 2-year holding period for that stock under SEC rule 144(d)(1) and thereafter would have been subject for 1 year to the volume

---

[8]  In his rebuttal report, Mr. Howard modified the amount of the blockage and/or SEC rule 144 discount that he believed should be applied in determining as of the valuation date the fair market value of ADDI&C's Winn-Dixie stock and its net asset value.  Mr. Howard made that change because of matters brought to his attention after he had prepared his expert report.  See infra note 10.

limitation on the sale of that stock prescribed by SEC rule 144(e)(2).[9]  See SEC rule 144(k).  The other method by which ADDI&C could have sold its Winn-Dixie stock was through the sale of that stock over a period of time consistent with the SEC rule 144(e)(1) volume limitation (dribble-out method).

The parties and their respective experts further agree that (1) because of the size of the block of Winn-Dixie stock owned by ADDI&C on the valuation date, ADDI&C could not have disposed of all of its Winn-Dixie stock at the same time without depressing the market value of such stock; and (2)(a) in order to dispose of its Winn-Dixie stock without depressing its market value and at the same time selling that stock in compliance with the restrictions in SEC rule 144, it would have taken ADDI&C 5 to 6 months after the valuation date to dispose of its Winn-Dixie stock under the dribble-out method, and (b) a purchaser of that stock would not have been subject to the 2-year holding period under SEC rule 144(d)(1) or the volume limitation in SEC rule 144(e)(2), see SEC rule 144.

Petitioner's expert Mr. Howard and respondent's expert Mr. Thomson agree that ADDI&C probably would have sold its Winn-Dixie stock pursuant to the dribble-out method.[10]  Mr. Pratt opined that

---

[9]  The volume limitation in SEC rule 144(e)(2) is identical to the SEC rule 144(e)(1) volume limitation.

[10]  Mr. Howard opined in his expert report that a sale by private placement would have been a "more efficient" way for ADDI&C to have disposed of its Winn-Dixie stock than the dribble-out

(continued...)

it was likely that ADDI&C would have disposed of its Winn-Dixie stock through a private placement.  On the record before us, we find that ADDI&C probably would have used the dribble-out method to sell its Winn-Dixie stock, since it was likely that such a sale would have resulted in a higher value for ADDI&C's Winn-Dixie stock than would have been yielded if that stock had been sold in a private placement.  That is because a nonaffiliated investor who purchased that stock in a private placement would have been subject to a 2-year holding period under SEC rule 144(d)(1) and thereafter would have been subject for one year to the volume limitation in SEC rule 144(e)(2).  See SEC rule 144(k).

Although respondent's expert Mr. Thomson acknowledges that ADDI&C's Winn-Dixie stock was subject to the SEC rule 144(e)(1) volume limitation and that, as we have found, ADDI&C probably

---

[10](...continued)
method.  However, after Mr. Howard prepared that report, he learned that a purchaser of ADDI&C's Winn-Dixie stock in a private placement would have been required to hold that stock for 2 years under SEC rule 144(d)(1) and thereafter would have been subject for 1 year to the volume limitation in SEC rule 144(e)(2).  Consequently, Mr. Howard changed the view reflected in his expert report regarding ADDI&C's sale of its Winn-Dixie stock by private placement and took the position in his rebuttal report and at trial that it was more likely that ADDI&C would have disposed of its Winn-Dixie stock through the dribble-out method because that method would have yielded a greater value for that stock than would have been obtained through its sale by private placement.  We reject any contention by respondent that Mr. Howard should not be permitted to change in his rebuttal report and at trial the position that he had taken in his expert report with respect to ADDI&C's Winn-Dixie stock.  See Rule 143(f).  The Court is interested in reaching the proper result, aided by witnesses who will recognize and correct an error.  We are not interested in attempts to force a party to maintain an erroneous or unreasonable position for strategic advantage.

would have used the dribble-out method to sell its Winn-Dixie stock over a 5-to-6 month period, he did not discount or adjust the NYSE price of that stock on the valuation date in order to arrive at its fair market value and ADDI&C's net asset value on that date. That is because, inter alia, Winn-Dixie's NYSE price "was on a rising trend line" from January 3, 1992, through November 2, 1992, the valuation date, and, in fact, "increased 72 percent during that period."[11]

To counter Mr. Thomson's view that no blockage and/or SEC rule 144 discount is warranted because, inter alia, the NYSE price of Winn-Dixie stock "was on a rising trend line" during the 10-month period preceding the valuation date, petitioner points out that a Value Line Investment Survey report (Value Line report) dated August 21, 1992, which was approximately 3 months before the valuation date, reported that "[the NYSE price of Winn-Dixie] stock has risen about 15% in the past few months. As a result, long-term total return prospects have been diminished". We do not believe that the opinion expressed in the Value Line report

---

[11] Nor did Mr. Thomson apply a premium to the NYSE price of ADDI&C Winn-Dixie stock. That is because, even though ADDI&C owned 1,020,666 shares of the outstanding Winn-Dixie stock, Mr. Thomson considered that block of stock, which represented only about 1.33 percent of the total outstanding shares of Winn-Dixie, to be "too small" to represent a "swing block of shares." It is noteworthy that petitioner's expert Mr. Pratt acknowledges that ADDI&C's stock interest in Winn-Dixie on the valuation date "is generally considered to be a significant investment. An investor would likely find it difficult to quickly accumulate such a large investment without some (typically upward) affect [sic] on the quoted market price on the subject security."

regarding "long-term total return prospects" for Winn-Dixie stock addressed the short-term prospects as of the valuation date regarding the NYSE price of that stock over the relatively short 5-to-6 month period after that date over which the parties and all the experts agree it would have taken ADDI&C to sell its Winn-Dixie stock under the dribble-out method.

Mr. Pratt determined that a 10-percent blockage and/or SEC rule 144 discount should be applied to the NYSE price of Winn-Dixie on the valuation date.  However, as stated above, we disagree with Mr. Pratt's view that it was likely that ADDI&C would have sold its Winn-Dixie stock in a private placement, rather than under the dribble-out method.  In addition, Mr. Pratt did not explain in his expert report, as required by Rule 143(f), how he arrived at a 10-percent blockage and/or SEC rule 144 discount, and we did not find his limited explanation in his rebuttal report and at trial of how he determined the amount of that discount to be particularly helpful.  See Rule 143(f)(1).  On the record before us, we shall not rely on Mr. Pratt's opinion as to whether a blockage and/or SEC rule 144 discount should be applied to the NYSE price of ADDI&C's Winn-Dixie stock on that date, nor shall we rely on his view regarding the amount of any such discount that should be applied in the event that we were to find that use of such a discount is warranted in the instant case.

Mr. Howard determined in his rebuttal report that a 4.9-percent blockage and/or SEC rule 144 discount should be applied to

Winn-Dixie's NYSE price on the valuation date in determining the fair market value of ADDI&C's Winn-Dixie stock and its net asset value on that date.  He arrived at that percentage discount based on the Black-Scholes options pricing model (Black-Scholes model), which is used to calculate the cost of a call or put option.  Mr. Howard used the Black-Scholes model to value a put option, which gives the holder the right to sell a specified asset at a specified price on (or before) a specified date.  Mr. Howard explained in his rebuttal report that the cost of a put option can be used to determine the cost of "locking-in" the price of a stock when the future price of that stock cannot be known with certainty.  Mr. Howard determined that the Black-Scholes model was a good measure of the discount associated with ADDI&C's exposure to the market risk that the NYSE price of its Winn-Dixie stock would have fallen during the 5-to-6 month period that would have been required to sell that stock under the dribble-out method.

Mr. Howard explained in his rebuttal report that the Black-Scholes model takes into account the following variables in arriving at the value of an option:  (1) Current stock price per share, (2) exercise price per share, (3) time to maturity, (4) risk-free interest rate, (5) volatility, and (6) continuous dividend yield.  Using the Black-Scholes model, Mr. Howard calculated that the cost of a 3-month put option on Winn-Dixie stock as of the valuation date would be $3.37, or 4.9 percent of Winn-Dixie's NYSE price on that date.

Respondent argues that use of the Black-Scholes model will always result in a blockage and/or SEC rule 144 discount. Mr. Howard agrees, and so do we. The Black-Scholes model takes into account, inter alia, a "risk-free interest rate" variable. Mr. Howard acknowledges in his rebuttal report that "there is always a cost to locking-in the value of a stock price to protect against market risk no matter what the specific inputs of the model", and he testified at trial that it would have taken 5 to 6 months for ADDI&C to sell its Winn-Dixie stock under the dribble-out method "without moving the market, [thereby] exposing that stock to market risks which always results in a decreased value, if for no other reason than present value purposes." On the instant record, we are not persuaded by Mr. Howard's use of the Black-Scholes model that a blockage and/or SEC rule 144 discount is warranted or that, even if such a discount were warranted, the amount of any such discount should be 4.9 percent.

Petitioner has the burden of establishing that a blockage and/or SEC rule 144 discount should be applied to the NYSE price on the valuation date of ADDI&C's Winn-Dixie stock and the amount of any such discount. Based on our examination of the entire record before us, we find that petitioner has failed to satisfy that burden. We further find that on the valuation date the fair market value of ADDI&C's Winn-Dixie stock was $70,043,204 and the net asset value of ADDI&C without taking into account any other discounts or adjustments was $80,140,269.

Petitioner and all of the experts, including respondent's expert, agree that, in determining the fair market value on the valuation date of each of the two blocks of ADDI&C stock at issue, it is necessary to reduce ADDI&C's net asset value on that date by applying a discount or adjustment attributable to ADDI&C's built-in capital gains tax. However, there are disagreements as to the amount of such a discount or adjustment. In addition, petitioner and petitioner's expert Mr. Howard disagree with petitioner's expert Mr. Pratt and respondent's expert Mr. Thomson as to the point at which such a discount or adjustment should be taken into account in the valuation process. Petitioner and petitioner's expert Mr. Howard believe that, in calculating ADDI&C's net asset value on the valuation date, the full amount of ADDI&C's built-in capital gains tax should be subtracted before any minority and lack-of-marketability discounts are applied. Petitioner's expert Mr. Pratt and respondent's expert Mr. Thomson believe that a 15-percent discount or adjustment attributable to ADDI&C's built-in capital gains tax should be taken into account as part of the lack-of-marketability discount that each agrees should be applied to ADDI&C's net asset value on the valuation date after that net asset value has been reduced by a minority discount. Of the 50 percent lack-of-marketability discount equal to $29,254,391 that Mr. Pratt determined should be applied, $8,776,317 is attributable to ADDI&C's built-in capital gains tax. Of the 38-percent lack-of-marketability discount equal to $26,798,906 that Mr. Thomson

determined should be applied, $10,578,516 is attributable to that tax.[12]

It is respondent's position that no discount or adjustment attributable to ADDI&C's built-in capital gains tax should be applied in determining the fair market value on the valuation date of each of the two blocks of stock in question. Respondent thus not only rejects the views of petitioner and petitioner's two experts, but also the opinion of respondent's expert Mr. Thomson, that such a discount or adjustment is warranted. In support of respondent's rejection of Mr. Thomson's opinion, respondent asserts on brief:

> Respondent recognizes that her own expert included the potential capital gains in his determination of an appropriate marketability discount; nevertheless, this inclusion is contrary to Federal tax law.

In support of respondent's position that a discount or adjustment attributable to ADDI&C's built-in capital gains tax is "contrary to Federal tax law", respondent advances the following argument in respondent's opening brief:

---

[12] There are differences between the respective dollar amounts of the 15-percent discount or adjustment attributable to ADDI&C's built-in capital gains tax, which both petitioner's expert Mr. Pratt and respondent's expert Mr. Thomson included as part of the respective lack-of-marketability discounts that they concluded should be applied to ADDI&C's net asset value on the valuation date after that net asset value has been reduced by a minority discount. That is because of the differences between those two experts (1) as to whether a blockage and/or SEC rule 144 discount is warranted and (2) as to the amount of the minority discount that each believed should be applied. See chart above showing, inter alia, those differences.

In an established line of cases, this Court has held that projected capital gains taxes do not reduce the value of closely held stock when liquidation is speculative. Ward v. Commissioner, 87 T.C. 78, 104 (1986); Estate of Andrews v. Commissioner, 79 T.C. 938, 942 (1982); Estate of Piper v. Commissioner, 72 T.C. 1062, 1086-1087 (1979); Estate of Cruikshank v. Commissioner, 9 T.C. 162, 165 (1947); Estate of Luton v. Commissioner, T.C. Memo. 1994-539, 68 T.C.M. (CCH) 1044, 1052 (1994); Estate of Bennett v. Commissioner, T.C. Memo. 1993-34, 65 T.C.M. (CCH) 1816, 1825 (1993). These cases reach that conclusion for two reasons.

First, prior to 1986, former I.R.C. §§ 336 and 337 allowed the tax-free liquidation of a corporation; the corporation could thereby completely avoid capital gains taxes upon a subsequent sale of all its assets. Courts reasoned that the corporation's ability to avoid taxes upon liquidation rendered the projected liability so speculative as to be irrelevant. Estate of Piper, 72 T.C. at 1087.

The repeal of those provisions, in the Tax Reform Act of 1986, P.L. 99-514, §§ 631-633, 100 Stat. 2269-2282, as reprinted in 1986-3 C.B. (Vol. 1) 186-199, did not foreclose the possibility of avoiding capital gains taxes at the corporate level upon sale of all assets. A subchapter C corporation can convert to a corporation described in subchapter S (I.R.C. § 1361, et. seq.) and avoid recognition of any gain, if the corporation retains the assets for a period of ten years from the date of conversion to an S corporation. See I.R.C. § 1374(d)(7). One of petitioner's experts recognized this possible alternative. Since Artemus D. Davis was a long term investor in Winn-Dixie stock, electing subchapter S appears to be a reasonable method to avoid the corporate level capital gains tax.

Although the willing buyer might incorporate a reduction in his price for costs of a subsequent liquidation, the willing seller has no incentive to accommodate that reduction. Why would the willing seller, knowing that the capital gains taxes can be deferred or avoided, agree to that reduction? Why would the willing seller, knowing further that the buyer controls the incidence of tax, agree to any reduction based on the buyer's purely speculative tax burden? See Mandelbaum v. Commissioner, T.C. Memo. 1995-254, 69 T.C.M. (CCH) 2852, 2866 (1995), aff'd, 91 F.3d 124 (3d Cir. 1996).

Second, and more importantly, when the actual facts do not suggest that the shareholders intended to liquidate the corporation, this Court has refused to assume that the hypothetical buyer would do so. <u>Estate of Ford v. Commissioner</u>, T.C. Memo. 1993-580, 66 T.C.M. (CCH) 1507, 1517 (1993), <u>aff'd</u>, 53 F.3d 924 (8th Cir. 1995); <u>Estate of Bennett v. Commissioner</u>, T.C. Memo. 1993-34, 65 T.C.M. (CCH) 1816, 1825 (1993). Here, petitioner stipulated that no liquidation was contemplated at the time of the subject gifts.

\* \* \* \* \* \* \*

Petitioner will no doubt argue that the Tax Court has not unequivocally stated that the potential capital gains taxes cannot be considered as a legal matter. Respondent recognizes that valuation is inherently a factual consideration. Nevertheless, this Court has consistently held that when liquidation is speculative, projected capital gains taxes do not reduce value, <u>Ward v. Commissioner</u>, 87 T.C. 78, 104 (1986); <u>Estate of Luton v. Commissioner</u>, T.C. Memo. 1994-539; <u>Estate of Ford v. Commissioner</u>, T.C. Memo. 1993-580; and that unforeseen future events cannot affect value, <u>Messing v. Commissioner</u>, 48 T.C. 502, 509 (1967); <u>Mandelbaum v. Commissioner</u>, T.C. Memo. 1995-255. The only proper construction of this conclusory language is that consideration of these speculative future events, including capital gains taxes, is improper as a legal matter. [Fn. ref. omitted.]

We reject respondent's position that, as a matter of law, no discount or adjustment attributable to ADDI&C's built-in capital gains tax is allowable in the instant case. Indeed, it appears that even respondent abandons, or at least contradicts, that position when respondent acknowledges in respondent's answering brief that

if a sale or liquidation of ADDI&C's assets was in fact contemplated on the valuation date <u>or</u> if, in fact, avoidance of a corporate level capital gains tax was not available, some reduction in value would be appropriate. \* \* \* [Emphasis added.]

Respondent thus concedes that, irrespective of whether a liquidation of ADDI&C or sale of its assets was planned or contemplated on the valuation date, "some reduction in value would be appropriate if, in fact, avoidance of a corporate level capital gains tax was not available".  However, respondent argues that although ADDI&C would have been required under the Federal income tax law in effect on the valuation date to recognize gains on its assets if it had liquidated and distributed those assets, sec. 336(a), made a nonliquidating distribution of one or more of those assets, sec. 311, or sold or otherwise disposed of those assets, sec. 1001(c), it could have avoided the tax on such gains.[13]  That is because, according to respondent, ADDI&C could have converted to S corporation status and retained its assets for 10 years from the date of such conversion, see sec. 1374(a), (d)(7), and petitioner's expert Mr. Pratt acknowledged that possibility in his expert report.

---

[13]  The Tax Reform Act of 1986 (1986 Act), Pub. L. 99-514, sec. 631-633, 100 Stat. 2269-2282, inter alia, modified sec. 336(a) in effect prior to passage of the 1986 Act, thereby repealing the doctrine (General Utilities doctrine) that had been established in General Utils. & Operating Co. v. Helvering, 296 U.S. 200 (1935). Under the General Utilities doctrine, corporations generally did not recognize gain on certain distributions of appreciated property to their shareholders and on certain liquidating sales of property.  See H. Rept. 99-426 at 274-275 (1985), 1986-3 C.B. (Vol. 2) 274-275.  The change to sec. 336(a) that was effected by the 1986 Act was intended "to require the corporate level recognition of gain on a corporation's sale or distribution of appreciated property, irrespective of whether it occurs in a liquidating or nonliquidating context."  H. Conf. Rept. 99-841, 1986-3 C.B. (Vol. 4) 204.

Although Mr. Pratt recognized in his expert report that as of the valuation date it would have been possible for ADDI&C to convert to an S corporation, he did not consider conversion to S corporation status to be likely as of that date for several reasons. First, according to Mr. Pratt, it is improper to assume, as respondent does, that ADDI&C would have been able to make an S corporation election. That is because such an assumption would have impermissibly limited the hypothetical willing buyer of each of the two blocks of stock at issue to certain individuals and entities who were permitted as of the valuation date to be shareholders of an S corporation, see sec. 1361(b)(1)(B) and (C), thereby improperly excluding as a hypothetical willing buyer of each such block, for example, a C corporation, see sec. 1361(b)(1)(B). In addition, Mr. Pratt believes that the assumption by respondent that none of ADDI&C's assets would be sold for 10 years would have reduced the marketability of each block of ADDI&C stock at issue, and such a requirement would have made it unlikely that ADDI&C's stockholders would have consented to an S corporation election. Mr. Pratt also notes that section 1362(d)(3) could be a problem for an investment company, like ADDI&C, unless ADDI&C were to retain its cattle operations or engage in some other operating business that generated substantially more gross income than the passive income generated by ADDI&C's other assets. That is because pursuant to section 1362(d)(3) an otherwise valid S corporation election will be

terminated if ADDI&C (1) had earnings and profits at the close of each of 3 consecutive taxable years that had been accumulated prior to the S corporation election, see sec. 1362(d)(3)(A) and (B), and (2) had more than 25 percent of its gross receipts for each of those taxable years from passive investment income, which includes dividend income, see sec. 1362(d)(3)(A), (D)(i).

Although we agree with Mr. Pratt that section 1362(d)(3) could have caused an otherwise valid S corporation election by ADDI&C to be terminated if ADDI&C were not to maintain its cattle operations or engage in some other operating business, there are no facts established by the record to indicate that as of the valuation date ADDI&C intended to curtail or eliminate its cattle operations. Nonetheless, we agree with the other two reasons advanced by Mr. Pratt in support of his view that as of the valuation date it was unlikely that ADDI&C would have converted to an S corporation. Based on the record before us, we reject respondent's unwarranted assumptions that ADDI&C could have avoided all of ADDI&C's built-in capital gains tax by having it elect S corporation status and by not permitting it to sell any of its assets for 10 years thereafter, and the record does not establish that there was any other way as of the valuation date by which ADDI&C could have avoided all of such tax.

We turn now to respondent's position in respondent's opening brief, which, as discussed above, we believe was contradicted by the position in respondent's answering brief. The former position

was that, irrespective of whether as of the valuation date ADDI&C could have avoided all of ADDI&C's built-in capital gains tax, no discount or adjustment attributable to that tax is permissible, as a matter of law, because as of that date no liquidation of ADDI&C or sale of its assets was planned or contemplated. The record shows that as of the valuation date ADDI&C's built-in capital gains tax relating to ADDI&C's built-in capital gains on all its assets was $26,686,614.[14] The record also establishes that as of the valuation date ADDI&C's Winn-Dixie stock constituted more than 85 percent of the aggregate fair market value of all of its assets; the portion of ADDI&C's built-in capital gains attributable to that stock (viz, $69,704,921) constituted more than 96 percent of such gains; and the portion of ADDI&C's built-in capital gains tax attributable to that stock (viz, approximately $25,660,000) constituted more than 96 percent of such tax. Petitioner and all of the experts believe that a hypothetical willing seller and a hypothetical willing buyer of each of the two 25-share blocks of ADDI&C stock at issue would have taken ADDI&C's built-in capital gains tax into account in

---

[14] We calculated ADDI&C's built-in capital gains tax by multiplying (1) the stipulated combined Federal and State capital gains tax rate of 37.63 percent by (2) ADDI&C's built-in capital gains reduced by $1,580,217 of net operating loss carryforwards that ADDI&C had as of the valuation date. In computing the amount of such gains, we utilized the stipulated historical cost basis and the fair market value of each of ADDI&C's assets, including its Winn-Dixie stock, as of the valuation date, since we have found on the instant record that petitioner has not established that any blockage and/or SEC rule 144 discount to the NYSE price on the valuation date of that stock is permissible.

arriving at the price on the valuation date at which each such block of stock would have changed hands and that therefore a discount or adjustment attributable to that tax should be applied in determining the fair market value of each such block.[15]  On the record before us, we agree.

We are convinced on the record in this case, and we find, that, even though no liquidation of ADDI&C or sale of its assets was planned or contemplated on the valuation date, a hypothetical willing seller and a hypothetical willing buyer would not have agreed on that date on a price for each of the blocks of stock in question that took no account of ADDI&C's built-in capital gains tax.  We are also persuaded on that record, and we find, that such a willing seller and such a willing buyer of each of the two blocks of ADDI&C stock at issue would have agreed on a price on the valuation date at which each such block would have changed hands that was less than the price that they would have agreed upon if there had been no ADDI&C's built-in capital gains tax as of that date.  Respondent's position to the contrary is inconsistent with the record in this case.[16]  We have found

---

[15]  As discussed herein, there are disagreements as to the amount of any such discount or adjustment and the point at which such a discount or adjustment should be taken into account in the valuation process.

[16]  Moreover, it is contrary to the record in this case to assume, as respondent apparently does, (1) that a hypothetical willing seller and a hypothetical willing buyer would not have been aware on the valuation date that Winn-Dixie stock, which constituted over 96 percent of ADDI&C's assets on that date,
(continued...)

nothing in the following cases on which respondent relies that requires us, as a matter of law, to alter our view:  Ward v. Commissioner, 87 T.C. 78 (1986); Estate of Andrews v. Commissioner, 79 T.C. 938 (1982); Estate of Piper v. Commissioner, 72 T.C. 1062 (1979); Estate of Cruikshank v. Commissioner, 9 T.C. 162 (1947); Estate of Luton v. Commissioner, T.C. Memo. 1994-539, supplemented by T.C. Memo. 1996-181; Estate of Ford v. Commissioner, T.C. Memo. 1993-580, affd. 53 F.3d 924 (8th Cir. 1995); Estate of Bennett v. Commissioner, T.C. Memo. 1993-34.

We note initially that one of the cases on which respondent relies, Estate of Bennett v. Commissioner, supra, involved a valuation date that preceded the repeal of the General Utilities doctrine and did not involve a request by the taxpayer for a reduction in valuing the stock interest in question for the capital gains tax that would have been due upon liquidation of the corporation whose stock was at issue, absent tax planning to avoid that tax which was permissible as of the valuation date in that case.  Instead, the taxpayer in the Estate of Bennett case asked the Court to reduce the value of the stock interest in question there by the "estimated costs of liquidation" which consisted of a "discount for commissions", a "discount for losses on

---

[16](...continued)
could be sold and bought on the open market with none of ADDI&C's built-in capital gains tax being applicable to that stock and (2) that that knowledge would not have affected the price to which they would have agreed on the valuation date for each of the blocks of stock at issue.

liquidation", and a "discount for the costs of overhead and sales costs".  Estate of Bennett v. Commissioner, supra.

Turning to the remaining cases on which respondent relies, it is significant to us that, except for Estate of Luton v. Commissioner, supra, none of the cases on which respondent relies indicates that any of the expert witnesses who testified in those cases considered corporate built-in capital gains tax as a factor in appraising the respective stock interests at issue in those cases.  In the Estate of Luton case, one of the taxpayer's experts, but not respondent's expert, reduced the asset value of each of the corporations at issue by liquidation costs that included, inter alia, Federal and State capital gains taxes that would have been incurred on liquidation of those corporations. Estate of Luton v. Commissioner, supra.  In contrast, in the present case, all of the experts for both parties are of the view that ADDI&C's built-in capital gains tax must be taken into account as a factor in ascertaining the fair market value of each of the two blocks of ADDI&C stock in question.

Except for Estate of Luton v. Commissioner, supra, and Estate of Ford v. Commissioner, supra, the other cases on which respondent relies (like Estate of Bennett v. Commissioner, supra) involved valuation dates that preceded the repeal of the General Utilities doctrine.  As we read all of those cases, including Estate of Luton and Estate of Ford, the taxpayers requested the Court for a reduction in valuing the respective stock interests in

question equal to the full amount of capital gains taxes that would have been due upon liquidation of the respective corporations whose stock was at issue in those cases, absent tax planning to avoid those taxes which was permissible as of the respective valuation dates in those cases. The Court denied each of those requests for a reduction for the full amount of such capital gains taxes where there was no evidence as of those respective valuation dates that a liquidation of the corporation in question or sale of corporate assets was planned or contemplated or that the full amount of such taxes could not have been avoided.[17]

In the present case, petitioner and all of the experts, including respondent's expert, believe, and we have found, that, in determining the fair market value on the valuation date of each of the blocks of stock at issue, it is necessary to apply a discount or adjustment attributable to ADDI&C's built-in capital

---

[17]  See Estate of Welch v. Commissioner, T.C. Memo. 1998-167, and Eisenberg v. Commissioner, T.C. Memo. 1997-483, which were decided after the parties filed their briefs in this case and which involved valuation dates that occurred after the repeal of the General Utilities doctrine. In neither of those cases was a liquidation of the corporation in question or a sale of its assets planned or contemplated as of the respective valuation dates. In valuing the respective stock interests at issue in those cases, the taxpayers asked the Court for a reduction equal to the full amount of capital gains taxes that would have been due upon liquidation of the respective corporations involved there, absent tax planning to avoid those taxes which was permissible as of the respective valuation dates. In neither of those cases does the Court indicate that any expert believed that such a reduction was warranted. The Court denied the taxpayers' requests.

gains tax because that is what a hypothetical willing seller and a hypothetical willing buyer would have done under the facts and circumstances existing on that date. Petitioner adopts the view of petitioner's expert Mr. Howard and argues that the full amount of such tax should reduce ADDI&C's net asset value in making that determination. On the record before us, we reject petitioner's position and Mr. Howard's opinion. On that record, we find that, where no liquidation of ADDI&C or sale of its assets was planned or contemplated on the valuation date, the full amount of ADDI&C's built-in capital gains tax may not be taken as a discount or adjustment in determining the fair market value on that date of each of the two blocks of stock in question, even though we have found that as of that date it was unlikely that ADDI&C could have avoided all of ADDI&C's built-in capital gains tax, and the record does not show that there was any other way as of that date by which ADDI&C could have avoided all of such tax. See Ward v. Commissioner, 87 T.C. 78 (1986); Estate of Andrews v. Commissioner, 79 T.C. 938 (1982); Estate of Piper v. Commissioner, 72 T.C. 1062 (1979).

We thus are in agreement with petitioner's expert Mr. Pratt and respondent's expert Mr. Thomson that in the present case it is not appropriate in valuing each of the two blocks of ADDI&C stock in question to apply a discount or adjustment equal to the full amount of ADDI&C's built-in capital gains tax. Nonetheless, on the instant record, we find that on the valuation date there was

even less of a ready market for each of those two blocks because of ADDI&C's built-in capital gains tax than there would have been for each such block without such a tax.  We thus also agree with and accept the views of petitioner's expert Mr. Pratt and respondent's expert Mr. Thomson that a discount or adjustment for some amount of ADDI&C's built-in capital gains tax should be taken into account in valuing each block of stock at issue and that such a discount or adjustment should be part of the lack-of-marketability discount that the parties and all of the experts concluded should be applied in that valuation process.[18]

Petitioner's expert Mr. Pratt included $8,776,317 of the total ADDI&C's built-in capital gains tax as part of the lack-of-marketability discount that he applied in valuing each of the

_____

[18] See Estate of Luton v. Commissioner, T.C. Memo. 1994-539, which involved, inter alia, valuation of a stock interest in a corporation for which an election to be taxed as an S corporation had been made and which was subject to the transitional rules in the Subchapter S Revision Act of 1982, Pub. L. 97-354, sec. 2, 96 Stat. 1669, 1683.  Consequently, that corporation was required to recognize certain of its net capital gain for the 3 taxable years immediately following the date of that S corporation election. Although we refused to allow a reduction equal to the full amount of the Federal and State capital gains taxes that would have been incurred if that corporation had liquidated on the valuation date involved in the Estate of Luton case, we found:

> Accordingly, with the exception of the 14-month period from the valuation date until December 31, 1988, RSJ, Inc.,'s built-in capital gains could be recognized without a corporate level tax.  Notwithstanding the potential elimination of any corporate level tax, we do recognize that some discount is in order.  We believe such discount is appropriately considered in the discount for lack of marketability, discussed below.
> * * *  [Emphasis added.]

Estate of Luton v. Commissioner, supra.

blocks of stock at issue, and respondent's expert Mr. Thomson included $10,578,516 of that total tax as part of the lack-of-marketability discount that he applied in that valuation process. Although those dollar amounts vary because of other differences that those experts have in the valuation process, see chart above, each of those experts independently concluded that a 15-percent discount or adjustment attributable to ADDI&C's built-in capital gains tax should be included as part of the respective lack-of-marketability discounts that they determined. We have examined the manner in which petitioner's expert Mr. Pratt and respondent's expert Mr. Thomson determined the respective amounts attributable to ADDI&C's built-in capital gains tax that they believe should be included as part of the total lack-of-marketability discount which should be applied in valuing each of the blocks of stock at issue. We are satisfied on the record before us that those amounts (i.e., $8,776,317 to $10,578,516) set the appropriate range from which we may determine the amount attributable to ADDI&C's built-in capital gains tax that should be included as part of the lack-of-marketability discount to be applied in determining the value of each such block. Bearing in mind that valuation is necessarily an approximation and a matter of judgment, rather than of mathematics, Hamm v. Commissioner, 325 F.2d at 940, on which petitioner has the burden of proof, Rule 142(a), we find on the instant record that $9 million which is attributable to ADDI&C's built-in capital gains tax should be included as part of the lack-

of-marketability discount that is to be applied in valuing each of the two blocks of ADDI&C's stock at issue.

We now turn to the balance of the lack-of-marketability discount attributable to factors other than ADDI&C's built-in capital gains tax that the parties and all of the experts agree should be applied in ascertaining the fair market value on the valuation date of each of the blocks of stock in question. Petitioner and petitioner's experts believe that the percentage amount thereof should be 35 percent, while respondent's expert Mr. Thomson believes that it should be 23 percent. Because of other differences among them, see chart above, the dollar amount of the lack-of-marketability discount that each determined without regard to any amount included therein that is attributable to ADDI&C's built-in capital gains tax ranges from $15,265,630 (Mr. Howard's determination) to $20,478,074 (Mr. Pratt's determination). Mr. Thomson's determination thereof was $16,220,390.

Mr. Howard determined to apply a 35-percent lack-of-marketability discount[19] by relying on a number of so-called restricted stock studies that are cited in his expert report. Those studies show the amounts of discounts at which private transactions in restricted stock (i.e., stock of public companies

---

[19] Hereinafter, unless otherwise stated, all references to a lack-of-marketability discount are to such a discount determined without regard to ADDI&C's built-in capital gains tax that we have found should be taken into account in arriving at the total amount of the lack-of-marketability discount that should be applied in this case.

that is restricted from trading on the open market for a certain period) took place compared to the prices on the open market of identical but unrestricted stock (i.e., stock of public companies that is freely tradable on the open market). Mr. Howard also relied on one so-called initial public offering (IPO) study cited in his expert report that shows the amounts of discounts at which private transactions in stock occurring shortly before an IPO took place compared to the prices of such stock after an IPO. In other words, that IPO study analyzed the prices of stock in private transactions compared to the prices of subsequent public offerings of stock of the same companies.

Mr. Pratt determined to apply a 35-percent lack-of-marketability discount by relying on the same restricted stock studies and the same IPO study on which Mr. Howard relied as well as on an additional restricted stock study and an additional IPO study.[20] In addition, Mr. Pratt considered ADDI&C's history as of the valuation date of not paying dividends in determining that discount. In order to ascertain whether the aggregate amount of the minority discount and the lack-of-marketability discount that he separately determined was reasonable, Mr. Pratt also examined certain transactions involving the trading of units of various publicly registered limited partnerships (limited partnership units) that were not trading on a formal exchange such as the

---

[20] In his rebuttal report, Mr. Howard also considered the additional restricted stock and IPO studies on which Mr. Pratt relied in his expert report.

NYSE.  Most of those partnerships were making distributions to their partners (distributing limited partnerships) as of the valuation date.  In examining the trading transactions of the limited partnership units, Mr. Pratt focused on those transactions involving publicly registered limited partnerships that, like ADDI&C, were not making distributions to partners (nondistributing limited partnerships) as of the valuation date.  After studying the data relating to the trading transactions of the limited partnership units, Mr. Pratt made a number of different calculations regarding the amounts of discounts from net asset value at which those units were trading, including separate calculations of the median amounts of the discounts from net asset value at which limited partnership units of distributing limited partnerships and nondistributing limited partners were trading.  Although Mr. Pratt reproduced in an exhibit to his expert report the data from the document (source document)[21] that he had used in making those calculations, he did not use the average discount that was printed in the source document and that was based on the average of the range of trading prices for each of those units that were reflected in that document.  Instead, Mr. Pratt admitted

---

[21]  Mr. Thomson included in his rebuttal report a copy of the source document from which Mr. Pratt obtained data with respect to the publicly registered limited partnership units that he examined.  That document provided the name of the limited partnership, the value per limited partnership unit, the range of prices at which that unit traded, and the average discount reflected in the trading price from the value of that unit, which was computed by using the average of that range of prices.

at trial that he calculated the amounts of discounts from net asset value at which the limited partnership units were trading based on the lowest trading prices listed in the source document, which resulted in his generating slightly higher discounts (about 3 percent higher) than would have been produced if he had used the average of the range of trading prices for each limited partnership unit that were reflected in the source document.

Mr. Thomson determined to apply a 23-percent lack-of-marketability discount. He stated in his expert report and at trial that the starting point for that discount was 33 to 36 percent (base range), which he identified as the discount for lack of marketability applicable to relatively small minority interests in companies that were for the most part operating companies. In arriving at the base range for his lack-of-marketability discount, Mr. Thomson reviewed certain, but not all, of the restricted stock studies considered by Mr. Howard and/or Mr. Pratt. Mr. Thomson found that the restricted stock studies that he examined showed that the discounts for restricted stock ranged from 26.5 percent to 36 percent, and he used the upper end of that range, i.e., 33 to 36 percent, as the base range for determining the lack-of-marketability discount for each of the blocks of ADDI&C stock at issue. Mr. Thomson also relied on the following factors to determine the specific lack-of-marketability discount applicable to each of those blocks: (1) The size of each block of ADDI&C stock at issue and its ability to influence management decisions;

(2) the swing block potential of each such block; (3) the public awareness or exposure of the business or assets of ADDI&C; (4) the type of business in which ADDI&C was engaged and the composition and relative attractiveness of its assets; (5) the financial strength of ADDI&C and its potential for paying dividends; (6) the basis of value and the method of value used to determine the asset value of ADDI&C; and (7) any other relevant factors that could influence the marketability of each of the blocks of stock at issue. Mr. Thomson concluded that the first six of the foregoing factors tended to lower the lack-of-marketability discount that should be applied to each of those blocks.[22] Consequently, he lowered the base range of 33 to 36 percent that he had used as a starting point to 20 to 24 percent. He then selected 23 percent as an appropriate lack-of-marketability discount.[23]

Respondent points out that neither Mr. Howard nor Mr. Pratt specifies in their respective expert reports and rebuttal reports how each used the restricted stock and IPO studies as well as factors specific to ADDI&C and each of the blocks of stock in question in order to arrive at a 35-percent lack-of-marketability

---

[22] Mr. Thomson determined that the seventh and last factor, which gives consideration to ADDI&C's built-in capital gains tax, should increase the lack-of-marketability discount that he otherwise determined by $10,578,516.

[23] Taking account of all the factors, including ADDI&C's built-in capital gains tax, that Mr. Thomson concluded were proper in arriving at the lack-of-marketability discount to be applied in valuing each of the two blocks of stock at issue, he determined a 38-percent lack-of-marketability discount.

discount.  We agree.  Nonetheless, we found those reports and the additional testimony at trial of Mr. Pratt to be quite helpful in ascertaining the lack-of-marketability discount that we shall apply in this case.

Petitioner contends that the 23-percent lack-of-marketability discount determined by Mr. Thomson is too low because, inter alia, Mr. Thomson failed to consider the IPO studies relied on by Mr. Howard and/or Mr. Pratt.  In Mr. Thomson's rebuttal report and at trial, he explained that, to the extent that the IPO studies examined data with respect to stock prices subsequent to the valuation date, he believed that those data could not be considered in valuing each of the two blocks of stock at issue because the Uniform Standards of Professional Appraisal Practice provide that the cutoff date for data used in a retrospective appraisal is the valuation date.  We agree.  However, Mr. Thomson admitted at trial that, to the extent that the IPO studies considered data with respect to stock prices prior to the valuation date, those data were readily available on the valuation date and could have been considered in valuing each such block.[24] We agree and find that Mr. Thomson should have considered the pre-

---

[24]  At trial, Mr. Thomson indicated that he believes that at least one of the IPO studies may be biased because it was based on "insider transactions".  However, Mr. Thomson's rebuttal report, which was submitted to the Court well before trial, did not reflect any such criticism of that IPO study (or of the other IPO study), which means to us that Mr. Thomson does not consider his criticism at trial about the possible bias of one of the IPO studies to be significant.

valuation date price data reflected in those IPO studies because they, together with the restricted stock studies, would have provided a more accurate base range and starting point for determining the appropriate lack-of-marketability discount than the base range that he determined. Mr. Howard and Mr. Pratt both explained in their rebuttal reports that the restricted stock studies examine stock that, although restricted for a period of time, is freely tradable after that period expires. They point out that the IPO studies, rather than the restricted stock studies, may be more indicative of the lack-of-marketability discount to be applied in the present case because the IPO studies examine the price differences between stock, like ADDI&C stock, that is not freely tradable and stock of the same corporations after it becomes freely tradable in an IPO. The average median price discount (adjusted for industry price/earnings multiples) for years prior to the valuation date (viz, 1975 through 1991) only, based upon an IPO study undertaken by Willamette Management Associates for those years as well as 1992 and 1993, was approximately 52 percent. The average median price discount for years prior to the valuation date (viz, 1980 through 1991) only, based upon an IPO study undertaken by Robert W. Baird & Company for those years as well as 1992 through 1995, was approximately 47 percent. On the record before us, we find that, in determining the lack-of-marketability discount that is applicable here without regard to ADDI&C's built-in capital gains tax, the prevaluation

date data in the IPO studies are relevant and provide some insight into the price differences between stock that is freely tradable and stock, like ADDI&C stock, that is not freely tradable.

Mr. Thomson stated in his expert report that, because each block of ADDI&C stock at issue represented 25.77 percent of the outstanding stock of ADDI&C, no shareholder had control of that corporation on the valuation date. However, Mr. Thomson concluded that each of those blocks could influence management and represented a swing block. Petitioner contends, Mr. Pratt believes, and Mr. Thomson acknowledged at trial that, in determining the value of each of the two blocks of stock in question, the actual owner of the other such block and the actual owner of the remaining ADDI&C stock on the valuation date should be considered. We agree. On that date, one of decedent's sons, who received the other block of stock from his father, and decedent, respectively, were the actual owners of that other block and that remaining stock. Petitioner contends that as of the valuation date it was unlikely that a member of decedent's family would join with an outsider to compel ADDI&C to act or not to act in a specified matter. We agree. On the record before us, we find that Mr. Thomson made invalid assumptions about, and gave undue weight to, the ability of each 25-share block of ADDI&C stock in question to influence management and to be a swing block.

Both Mr. Howard and Mr. Pratt criticize Mr. Thomson for, inter alia, his emphasis in determining a lack-of-marketability discount

on ADDI&C's capacity to pay dividends and his disregard of its 45-year history as of the valuation date of not paying dividends.[25] As of that date, each of those blocks of stock constituted a minority interest, and neither represented a swing block. On the instant record, we find that a hypothetical willing seller and a hypothetical willing buyer would have no reason to believe on the valuation date that ADDI&C's 45-year history of not paying dividends was likely to change. See also Rev. Rul. 59-60, sec. 5, 1959-1 C.B. at 242-243 ("adjusted net worth should be accorded greater weight in valuing the stock of a closely held investment * * * company, whether or not family owned, than any of the other customary yardsticks of appraisal, such as earnings and dividend paying capacity.").

On the record before us, we are satisfied that the respective amounts of the lack-of-marketability discounts determined by the experts without regard to ADDI&C's built-in capital gains tax (i.e., $15,265,630 determined by Mr. Howard, $16,220,390 determined by Mr. Thomson, and $20,478,074 determined by Mr. Pratt) set the appropriate range from which we may determine the lack-of-marketability discount without regard to such tax. In making that determination, we bear in mind that valuation is necessarily an approximation and a matter of judgment, rather than

---

[25] Both of petitioner's experts point out that, except for a shareholder's use of an airplane during 1990 that was treated for that year as a dividend for Federal income tax purposes, ADDI&C had neither declared nor paid any dividends to its shareholders throughout its 45-year history as of the valuation date.

of mathematics, <u>Hamm v. Commissioner</u>, 325 F.2d at 940, on which petitioner has the burden of proof, Rule 142(a).  Based on our examination of the entire record in this case, and using the figures in the restricted stock and IPO studies cited in the expert reports of Mr. Howard and Mr. Pratt as benchmarks of the lack-of-marketability discount without regard to ADDI&C's built-in capital gains tax and evaluating various factors specific to ADDI&C and each of the blocks of stock in question, including the factors listed in the expert report of Mr. Thomson, we find that the lack-of-marketability discount without regard to that tax should be $19 million.  We further find that the total lack-of-marketability discount that should be applied in this case and that we have found should include $9 million which is attributable to ADDI&C'S built-in capital gains tax is $28 million.

Based on our examination of the entire record in this case, we find that on the valuation date the fair market value of each of the two 25-share blocks of ADDI&C stock in question was $10,338,725, or $413,549 per share.

To reflect the foregoing,

<u>Decision will be entered under Rule 155</u>.